ANITA LASTER MAYS, P.J.:
*712 {¶ 1} Defendant-appellant Maurice L. Bradford ("appellant") appeals his bench trial convictions for two felonies of the third degree: shooting a firearm over a public road with gun specifications, and having a weapon while under disability. Appellant was sentenced to a prison term of four years and nine months.[1] We reverse the judgment of the trial court and vacate the convictions.
I. Background and Facts
A. Cuyahoga C.P. No. CR-15-600941-D
{¶ 2} Appellant, generally known by the nickname "T. Bear," short for "Teddy Bear," was originally indicted on August 17, 2015, in Cuyahoga C.P. No. CR-15-598409-A as part of an 85-count secret indictment naming 17 individuals. The case was dismissed and reindicted in Cuyahoga C.P. No. CR-15-600941-D charging appellant and codefendants Andre Ingram ("Ingram"); Bradford's brothers, Bradley Bradford ("Bradley") and Lawrence Black ("Black"); and Edwina Neal ("Neal"), the mother of the three brothers, with counts relating to several shooting incidents. The counts included charges of gang activity ("Gang Case "). Appellant was named in a single incident charged in the Gang Case.
{¶ 3} The indictments related to a series of shootings allegedly related to gang activity between the Broadway Gang ("Broadway") and Fleet Boys ("Fleet") from January to November 2015. The gangs' names were adopted based on the geographic areas in the southeast area of Cleveland in which the members resided.
B. Cuyahoga C.P. No. CR-16-604662-A
{¶ 4} On March 23, 2016, a 10-count indictment was issued against appellant in Cuyahoga C.P. No. CR-16-604662 ("Superior Case "). The state alleged that on July 3, 2015, appellant was involved "in a gun battle with another vehicle" in the area of Superior Avenue and East 92nd Street, causing injury to the hand of a seven-year-old boy. (Tr. 124.) Appellant was charged with attempted murder, two counts of felonious assault, two counts of discharge of firearm on prohibited premises, four counts of improperly discharging a firearm into a habitation, and one count of having a weapon while under disability.
{¶ 5} At the time of the indictment, appellant was awaiting sentencing for a guilty plea entered on April 14, 2015, to a fifth-degree felony drug possession ( R.C. 2925.11(A) ) in Cuyahoga C.P. No. CR-14-584927. The case was assigned to the mental health and developmental disabilities docket based on the medical report of Dr. Michael Aronoff upon examining appellant. Appellant was prescribed Risperdal and Lexapro. Sentencing for that case was stayed until the time of the verdict in the instant case.[2]
*713 {¶ 6} On September 14, 2016, Ingram, Neal, Bradley, Black, and appellant signed jury waivers. Neal entered a guilty plea to Count 46 of the Gang Case indictment for improper handling of firearms in a motor vehicle. The indictment stated that on July 6, 2015, Neal knowingly transported a loaded .40 caliber Smith & Wesson handgun in a 2004 black Ford SUV that was accessible to any individual in the vehicle ( R.C. 2923.16(B) ), a fourth-degree felony. The weapon and vehicle were forfeited, and the remaining charges dismissed. Neal was sentenced on October 31, 2016, to community control with conditions.
{¶ 7} Nineteen-year-old Ingram entered a guilty plea to Count 1, participating in a criminal gang ( R.C. 2923.42(A) ), a second-degree felony, and Count 24, felonious assault ( R.C. 2903.11(A)(2) ), a second-degree felony, with a three-year firearm specification. The five-year agreed sentence ran consecutive to Ingram's then current five-year sentence in State v. Ingram , Cuyahoga C.P. No. CR-15-598906, for felonious assault ( R.C. 2903.11(A)(1) ). The remaining charges were dismissed. Ingram did not agree to testify against the remaining defendants.
{¶ 8} Appellant, Bradley, and Black rejected plea deals involving 5- to 15-year-incarceration-recommendations in the Gang Case. (Cuyahoga C.P. No. CR-15-600941.) The Gang Case and the Superior Case against appellant only (Cuyahoga C.P. No. CR-16-604662) were consolidated for purposes of the bench trial. The majority of the evidence related to codefendants Bradley and Black.
{¶ 9} The trial court held that appellant was not guilty of all counts in the Gang Case , including finding that appellant was not a participant in a criminal gang, as even "the state's own witnesses suggested otherwise." (Tr. 1487.)
C. Superior Case
{¶ 10} In light of appellant's exoneration in the Gang Case , we focus our analysis on the evidence pertinent to the convictions underlying the instant appeal in the Superior Case .
{¶ 11} Fred Booker ("Booker") testified as part of a plea agreement. Booker stated that he would "hang out" with individuals in the Fleet gang including Black and Bradley, but as to appellant "Teddy Bear," Booker stated:
PROSECUTOR: How about Maurice Bradford?
BOOKER: Yeah, I be around him but I never sincerely, like we never hung out together, like was in the streets together.
PROSECUTOR: All right. So he was different than the other ones you hung out with?
BOOKER: Yeah.
(Tr. 584.)
{¶ 12} Booker confirmed during cross-examination that appellant did not hang out with the group. Appellant was never involved in discussions about shooting or retaliating, and was devoted to caring for his brother Larry Bradford, a wheelchair bound paraplegic, and appellant's two children. Booker never heard appellant talk about having or using guns or saw him with one.
{¶ 13} Booker was aware that appellant had been shot at several times.
COUNSEL: And do you know why he's been shot at?
BOOKER: Because he be with-around Fleet and his family from Fleet.
COUNSEL: Okay. Do you know of him ever shooting back at anybody?
*714 BOOKER: No.
(Tr. 670.)
{¶ 14} Eight-year-old victim E.J. testified that he was playing outside in the street and on the sidewalks with his siblings and friends on July 3, 2015, near his former residence on East 92nd Street just south of Superior Avenue. The children heard "pops" and "whistles," and E.J.'s father yelled at them to duck and run. (Tr. 882.) E.J. was running toward his father who was in front of their house when he saw blood on his right hand.
{¶ 15} Traffic proceeding on East 92nd Street is limited to one-way, northbound only. E.J. did not see a car drive down his street in the wrong direction, but he did see a car turn right at the first two-way street at the southerly end of his block. E.J. did not see the car pass him on the street. There was no cross-examination of E.J.'s testimony.
{¶ 16} On July 3, 2015, nurse Oina Friedman ("Friedman") was attending a barbeque at the home of his friend, Andre, who lived several houses south of E.J.'s residence. Andre is also E.J.'s uncle. The home was located on East 92nd Street and Shipherd Avenue, the intersection where E.J. observed a car turn right. According to Friedman's description, based on review of depictions referenced in the transcript but not placed in the record, Andre's residence was located at least ten houses from, and south of, the intersection of Superior and East 92nd Street. Andre's house was on the westside of the street. Friedman arrived at the function about 5:30 p.m. The shooting occurred at approximately 9:00 p.m.
{¶ 17} Friedman was descending the front steps of the home just a few feet from the sidewalk when he heard shooting. Friedman described a dark sedan and a Dodge Charger proceeding easterly at Superior and East 92nd Street, at the other end of the block. East 92nd Street is a one-way street that allows traffic to proceed northerly to Superior. "The Dodge Charger was basically taking shots from the other car, and the Dodge Charger [turned and] came up 92nd the wrong way because 92nd empties out onto Superior." (Tr. 939.)
{¶ 18} The Charger turned right onto East 92nd Street, driving the wrong way down the one-way street, and the "other car that was shooting at him, they shot and they kept going." (Tr. 940.) "The guy in the Dodge Charger, he appeared to just be trying to get away. He was-he wasn't having whatever it was. I don't know what it was." (Tr. 940.)
{¶ 19} Friedman did not see how the shooting began. "I just saw the end result, the shooting and the guy in the Dodge trying to flee from that corner and his only way out was making a right hand turn [onto East 92nd] because it was during traffic." (Tr. 940.) Friedman stated that, as the Charger turned the corner at the other end of the block, he could see a single hand pointing a gun out of the back passenger window of the Charger. "[A]nd what he ended up-the shooting that he ended up doing was nothing, you know. He was trying to basically defend himself. He shot-it was a hand held out [of the back passenger window]." (Tr. 941.) Friedman states the Charger was at the other end of the block from where he was standing, in front of the first house on East 92nd Street, at least nine houses from where Friedman was standing, when he observed the hand in the back car window.
{¶ 20} The Charger proceeded down East 92nd Street and passed Friedman as he began walking toward Superior to where E.J. was standing with his father. The Charger turned right at Shipherd. E.J.'s hand was bleeding. Friedman called *715 911 and helped calm E.J. and his parents until the emergency medical service ("EMS") arrived. Friedman was able to give partial license plate information.
{¶ 21} Friedman could not see the driver of the Charger. The windows were rolled up and darkly tinted. He assumed there had to be a second person in the Charger based on his observation of the extended hand in the rear passenger window, "unless the driver was Stretch Armstrong." (Tr. 947.) He estimated that the Charger fired about six shots when it turned onto East 92nd Street, and the sedan fired 40 or more shots. "[T]he Charger was clearly outgunned and outmanned by the guys" in the other car. (Tr. 947.)
{¶ 22} Friedman did not see how shooting from the Charger could have impacted E.J. The sedan initiated the gun fire. (Tr. 953.) Friedman could see that the occupants of the sedan were "hanging out the window" shooting. (Tr. 954.) The sedan's occupants had handguns, and one had a larger gun. The hand in the Charger window held a small handgun. (Tr. 955.)
{¶ 23} On July 3, 2015, Detective Joseph Edwards ("Det. Edwards") was working as a Third District Cleveland Police patrolman. Det. Edwards and his partner, Officer David Crane ("Officer Crane"), responded to the 911 call reporting the shooting that was received at approximately 9:00 p.m. They discovered a number of shell casings near the crosswalk at the intersection of East 92nd Street and Superior. A bullet also entered a home across the street from E.J.'s home, but there were no injuries. The bullet entered through the gutter and into the living room from the direction of Superior. (Tr. 968.)
{¶ 24} Det. Edwards interviewed E.J.'s father and Friedman at the father's home. He was informed that a Charger with tinted windows and chrome or silver wheels was observed. (Tr. 969.)
{¶ 25} Detective Lawayne Smith ("Det. Smith") of the crime scene investigative unit confirmed the caliber of the casings located at the scene. No bullets were recovered at the damaged home location; however, the bullet entered from the northerly side of the home from Superior.
{¶ 26} Detective Todd Wiles ("Det. Wiles") was employed as a civilian crime analyst for the Cleveland Police Department. His testimony focused, over extensive defense objections based on State v. Dunn , 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, 2015 WL 4656534,[3] on cell phone calls and texts, and which tower locations were utilized by the cell phone in question, known as cell phone tower mapping. Records were secured from the cell phone provider via subpoena. After much discussion about the inferences to be drawn from the testimony and evidence, the trial court determined it would allow the information.
{¶ 27} Det. Wiles used the cell phone records for a cell phone allegedly owned by appellant that were secured by Detective Aaron Reese ("Det. Reese") to create *716 a map for the period July 3, 2015, through the end of July 4, 2015. Excerpts of the five pages of the records reflected cell phone calls during that time period.
{¶ 28} Detective Aaron Reese ("Det. Reese"), a 20-year police veteran, became a detective in 2014. He responded to the July 3, 2015 shooting of E.J. Det. Reese talked with witnesses and police at the scene and visited the hospital where E.J. was being treated. He subsequently followed up with the officers that prepared the initial crime report and the listed witnesses.
{¶ 29} A "gray or a silver or even a charcoal colored Dodge Charger" was at the scene. (Tr. 1100.) The partial license plate information resulted in a broad base of possibilities. Det. Reese made no progress until he received information regarding other cases gleaned from the National Integrated Ballistic Identification Network ("NIBIN"), managed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). NIBIN maintains ballistic evidence records including shell casings.
{¶ 30} The NIBIN reports listed a number of incidents involving purported members of Broadway and Fleet. The reports included incidents where appellant was a victim, which "jogged" Det. Reese's memory. (Tr. 1105.) He then recalled meeting appellant previously when appellant and Neal flagged him down about a carjacking. (Tr. 1102.)
{¶ 31} Det. Reese had a "good conversation" with appellant and Neal. He drove them home and may have driven one of appellant's brothers home also. (Tr. 1102-1103.) Det. Reese recalled that the alleged carjacking was of the Charger that was actually owned by Neal. The vehicle had not been stolen but had been towed for an investigation by the police relating to shootings involved in the Gang Case. Det. Reese later learned that there were bullet holes in the vehicle, but he did not know whether they were "fresh" nor could the source be identified. (Tr. 1107.)
{¶ 32} Det. Reese obtained a search warrant for the cell phone that appellant had in his possession when he was arrested to see if there was any evidence in the cell phone to link appellant to E.J.'s shooting. (Tr. 1109.) He also obtained a search warrant for records from the cell phone provider.
{¶ 33} Det. Reese received the cell phone tower mapping information from Det. Wiles and began assembling a grand jury package based on the mapping information, the NIBIN hits for shell casings where appellant was allegedly present, and the witnesses' statements that the Charger was present at Superior.
{¶ 34} Det. Reese admitted that he could not tell from the shell casing information whether appellant "was shooting, being shot at" or was just present at the scenes where the casings were found. (Tr. 1112.) He concluded that appellant was at Superior based on cell tower mapping and also concluded appellant was in possession of the phone on the night July 3, 2015, because of photographs taken with the phone that morning.
{¶ 35} None of the witnesses could make a physical identification of appellant. (Tr. 1115.) The 40 casings determined to be NIBIN hits were related to various shooting incidents. However, Det. Reese was not aware that none of the casings had been linked to appellant, except as a victim, but were matched to other individuals. In fact, the eight shell casings found at Superior were all linked to a gun connected to a Broadway gang member, Deron *717 Williams ("Williams").[4] (Tr. 1126.)
{¶ 36} In some cases, Det. Reese did not review the police reports, and in other cases, the information had been updated after the grand jury information was assembled. (Tr. 1122-1126.) Det. Reese admitted in response to questions by the trial court that if he had the updated information, he would have factored it into his decision-making regarding appellant's prosecution.
COURT: Had you had this information that [defense counsel] suggests regarding casings that were recovered and when and where and how, you would have factored that into your decision-making?
WITNESS: Yes.
COURT: You acknowledge that would be important to have?
WITNESS: Yes.
(Tr. 1137.)
{¶ 37} Det. Reese also explained that sometimes the NIBIN data is entered into the system much later than the information is discovered. "In fact, I've had cases where I find out about NIBIN hits postconviction, a year later but come to find out our lab had the information perhaps six months previously." Det. Reese assured the trial court that he did not overlook the information or choose not to follow up. (Tr. 1138.)
{¶ 38} Kristen Koeth ("Koeth"), a scientific examiner with the Cleveland Police Department's Department of Public Safety, was permitted to testify as a ballistics expert. (Tr. 1146.) Koeth reviewed the ballistic reports including the types of weapons involved in the shooting and, where known, who was associated with the weapon. Defense counsel ultimately engaged in an on-the-record stipulation to the ballistic evidence. Koeth confirmed that none of the evidence was tied to appellant.
{¶ 39} Detective Al Johnson ("Det. Johnson") has been a detective with the Cleveland Police Gang Impact Unit since 2013 and with the department since 2007. Det. Johnson also served as a corrections officer and became familiar with the Heartless Felons gang within the jail as well as during his tenure as a patrolman with the Community Services Unit. He was also familiar with other gangs such as the Aryan Brotherhood, Crips, Bloods, and Vice Lords.
{¶ 40} Det. Johnson testifies at gang cases to provide information about gang operations and has testified as a gang expert in four cases. Det. Johnson explained the history of various youth gangs, including the Heartless Felons, which was formed in the juvenile corrections system in 2000 to 2002 to protect themselves against other youth groups in the juvenile system. A lot of his information is obtained from social media.
{¶ 41} Det. Johnson talked about the spring and summer 2015 shootings involving Fleet and Broadway. The shootings ultimately ended about the time that Bradley was shot and almost killed. Blanket arrest warrants were issued for suspected Broadway and Fleet members, including "Papa" Houston, "Ballzy" Palmer, Booker, Black, Neal, and appellant. Bradley was still hospitalized. (Tr. 1223.)
{¶ 42} Det. Johnson reviewed numerous photographs extracted from social media accounts. He identified individuals depicted in the media photographs, confirming *718 the various gang memberships of multiple individuals, described the scenes, including guns and gang signs, and read some of the social media comments.
{¶ 43} The information regarding appellant was distinguishable from that of the other individuals. The only social media posts of appellant were family photographs with his children and paraplegic brother, Larry. In spite of the lack of any gang affiliation evidence, Det. Johnson offered an "opinion" that appellant was "affiliated" with Fleet:
COUNSEL: Moving on to Maurice Bradford, did you render any opinion as to whether or not he was affiliated with any gangs during this time in 2015 we've been speaking of?
WITNESS: Yes.
COUNSEL: And what was your-what is your opinion ?
WITNESS: Again, with Maurice, Maurice was not a Heartless Felon. He was not ACG [Ave Click Goon gang], but he was affiliated, and he would be under the Fleet Ave Gang.
COUNSEL: And we don't really have any photo of him flashing the gang signs like that, or like some of the other members, correct?
WITNESS: Correct.
COUNSEL: Does that-the absence of those photographs or social media, how did that affect your opinion in this case?
WITNESS: My opinion was based on incidents and the surrounding-and the people that were with the incidents, the people that were involved in the incidents going back and forth.
COUNSEL: Okay. So you based it on the associations and the incidents. You're referring to shootings, correct?
WITNESS: Correct.
(Emphasis added.) (Tr. 1311-1312.)
{¶ 44} Det. Johnson confirmed that appellant was never found to be in possession of a gun, nor was there evidence of him having a gun, gang clothing, gang tattoos, or making hand signals in the 852 pages of social media relating to appellant. Appellant's tattoos were of his children's names, and his email account name is "bestfather24." (Tr. 1356.)
COUNSEL: And in those 852 Instagram posts of Maurice, there was no evidence of gang involvement, was there?"
WITNESS: No.
COURT: There wasn't any?
WITNESS: No, there was not.
COURT: Okay. Thank you.[5]
(Tr. 1328.)
{¶ 45} A review of the photographs from appellant's Instagram account depicted his children engaged in various recreational and family activities including pushing his brother Larry in Larry's wheelchair at the nursing home where Larry is sometimes confined.
COUNSEL: And, Detective, we can go on through 852 of those, but that's a sampling of pretty much what Maurice's Instagram account consisted of, isn't it?
*719 WITNESS: Yes.
(Tr. 1331.)
{¶ 46} Det. Johnson also identified a photograph from appellant's phone of an envelope with appellant's name on it. The meta data indicated the photograph was modified on May 2016 and created at 3:38 p.m. on July 3, 2015. Det. Johnson confirmed that there was no way to tell who created or modified the cell phone photograph.
{¶ 47} Det. Johnson prepared a 21-page report regarding the Broadway Fleet gang activity and listing dates of shootings, names of gang members, and gang affiliations. Appellant's name is mentioned three times: (1) as the victim of a May 17, 2015 shooting, (2) a victim of a July 6, 2015 shooting attempt, and (3) a victim of the shooting and fire-bombing of the family residence. Det. Johnson concluded that appellant is a gang member in spite of the fact that his name was not associated with the listed gang activities.
{¶ 48} Appellant was found not guilty of all charges in the Gang Case , including the finding that appellant was not a gang member. The trial court initially found appellant guilty of several charges in the Superior Case. Appellant filed a combined motion for a new trial and for judgment of acquittal. After reconsideration and clarification of certain issues, appellant was ultimately found guilty of the two felonies of the third degree on appeal in this case relating solely to the Superior Case : Count 5: discharge of firearm on or near prohibited premises ( R.C. 2923.162(A)(3) ), with firearm specifications for one-year ( R.C. 2941.141(A) ) and three years ( R.C. 2941.145(A) ), and Count 10, having weapons while under disability ( R.C. 2923.13(A)(3) ). As mentioned, appellant was sentenced to four years, nine months to be served concurrently with Cuyahoga C.P. No. CR-585927.
{¶ 49} Appellant appeals the convictions. We reverse.
II. Assignments of Error
{¶ 50} Appellant poses six assignments of error:
I. Counsel [was] ineffective by stipulating to ballistic evidence, stipulating to qualifications of a state's expert witness and failing to challenge the NIBIN evidence that linked Bradley to the crime scene.
II. Derivative evidence concerning appellant's connection to the Dodge Charger obtained due to NIBIN as testified to by Detective Reese should have been excluded and was the result of ineffective assistance of counsel.
III. Prosecutorial misconduct took place in final arguments when the State argued that Maurice Bradley was in area of E. 92nd Street and Superior based on his cell phone records when the State presented no expert testimony concerning location of appellant and his cell phone at relevant times.
IV. Counsel was ineffective under Strickland for failing to object to State's improper closing argument as detailed in the third assignment of error.
V. There was insufficient evidence that Maurice Bradley was at the crime scene or involved in the crimes at E. 92nd Street and Superior Avenue and due process under the State and Federal Constitution has been violated.
VI. The convictions are not supported by the manifest weight of the evidence.
*720 III. Analysis
A. Sufficiency and Manifest Weight of the Evidence
{¶ 51} We address the challenges to the fifth and sixth assignments of error as we find them to be dispositive of this case. We find that the evidence was insufficient as a matter of law and therefore against the manifest weight of the evidence.
1. Standard of Review
{¶ 52} A challenge to the sufficiency of the evidence questions whether the state met its burden of production. A manifest weight challenge asks whether the state met its burden of persuasion.
{¶ 53} The Ohio Supreme Court has explained that, "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." State v. Wilson , 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing Thompkins at 386-387, 678 N.E.2d 541. An appellate court, "may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." Thompkins at 387, 678 N.E.2d 541.
{¶ 54} The question of "[w]hether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson , 162 Ohio St. 486, 124 N.E.2d 148 (1955)." Thompkins at 386, 678 N.E.2d 541. It is "an inquiry about due process, * * * the resolution of which does not allow the court to weigh the evidence." State v. Martin , 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).
{¶ 55} In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. State v. Starks, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, 2009 WL 1965296, ¶ 25, citing Thompkins at 387, 678 N.E.2d 541. " '[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " State v. Leonard , 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting State v. Jenks , 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. Tenace , 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386.
{¶ 56} After consideration of whether the evidence is sufficient as a matter of law, a manifest weight inquiry looks at whether the evidence was substantial enough for a jury to reasonably conclude that all of the elements of the alleged crime have been proved beyond a reasonable doubt. The "appellate court sits 'as a thirteenth juror.' " Thompkins at 387, 678 N.E.2d 541, quoting Tibbs v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court reviews the entire record, considers the credibility of the witnesses, weighs the evidence and all reasonable inferences, and determines whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Martin at 175, 485 N.E.2d 717 ; Leonard at ¶ 68.
{¶ 57} In weighing the evidence, we consider whether a greater amount of *721 credible trial evidence supports "one side of the issue rather than the other." Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541.
It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. " (Emphasis added.) Black's [Law Dictionary ] 1594 [ (6th Ed.1990) ].
Id.
2. Discussion
{¶ 58} R.C. 2923.13(A)(3), having weapons while under disability, prohibits a person who
is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.
{¶ 59} R.C. 2923.162(A)(3) provides that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway." It is a strict liability offense. State v. Holloway , 8th Dist. Cuyahoga No. 101289, 2015-Ohio-4578, 2015 WL 6778526, ¶ 16. According to the indictment, on or about July 3, 2015, appellant "did discharge a firearm upon or over a public highway and the violation created a substantial risk of physical harm to any person or caused serious physical harm to property." The charge included one- and three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A), respectively.
{¶ 60} The state relied on cases by this court standing for the premise that everyone engaged in a "shoot-out" is responsible for injuries. State v. Spates , 8th Dist. Cuyahoga No. 100933, 2015-Ohio-1014, 2015 WL 1249711 ; State v. Catron , 8th Dist. Cuyahoga No. 101789, 2015-Ohio-2697, 2015 WL 4043004 ; and State v. Hoston , 8th Dist. Cuyahoga No. 102730, 2015-Ohio-5422, 2015 WL 9438505. However, the trial court focused on the theory of complicity in reaching the decision in this case. We note that there were no codefendants in this case and the express charges did not include complicity, aiding, or abetting.
{¶ 61} A complicity charge may be stated by statute or in terms of the principal offense:
"Pursuant to R.C. 2923.03(F), a charge of complicity may be stated in terms of R.C. 2923.03 or in terms of the principal offense. State v. Caldwell , 19 Ohio App.3d 104, 483 N.E.2d 187 ( [8th Dist.]1984). Where one is charged in terms of the principal offense, he or she is on notice, by operation of R.C. 2923.03(F), that evidence could be presented that the defendant was either a principal or an aider and abettor for that offense. See State v. Dotson , 35 Ohio App.3d 135, 520 N.E.2d 240 (1987). Because a charge of complicity may be stated in terms of either the principal offense or in terms of R.C. 2923.03, the complicity section, the indictment was not amended when the court instructed the jury that they could find Johnson guilty under the complicity theory."
State v. Smith, 8th Dist. Cuyahoga No. 86690, 2006-Ohio-3156, 2006 WL 1704530, ¶ 65, quoting State v. Johnson , 8th Dist. Cuyahoga Nos. 81692 and 81963, 2003-Ohio-3241, 2003 WL 21419631.
*722 {¶ 62} The complicity statute provides in part:
(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
(1) Solicit or procure another to commit the offense;
(2) Aid or abet another in committing the offense;
(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code ;
(4) Cause an innocent or irresponsible person to commit the offense.
(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender
* * *
(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.
R.C. 2923.03.
{¶ 63} In order for complicity to be considered, there must be "sufficient evidence in the record to establish complicity." Smith at ¶ 66, citing State v. Woods , 48 Ohio App.3d 1, 548 N.E.2d 954 (1st Dist.1988). The trial court stated here that:
Clearly shots were fired. I find that the state proved, beyond a reasonable doubt, that Mr. Bradford was involved. His vehicle was identified. There was a lot of telephonic activity at or about the time that this occurred. That activity was on a telephone ultimately-cell phone ultimately recovered from the person of Mr. Bradford.
(Tr. 1483.)
{¶ 64} For verification of shots fired attributable to appellant by complicity, aiding, or abetting, the trial court gave great deference to the testimony of Friedman, who the trial court stated "had nothing to gain from his testimony." (Tr. 1483.) Friedman testified that shots were fired from the back seat of the Charger as it proceeded down East 92nd Street. The trial court acknowledged that, in appellant's favor, the testimony also established a "higher aggression on the part of the other automobile that was firing" at appellant's vehicle. (Tr. 1483.)
{¶ 65} The court noted that Friedman "suggested there may have been, or must have been more than one person in Mr. Bradford's vehicle." (Tr. 1483.) As a result, the trial court concluded "[n]evertheless, even if Mr. Bradford was not himself firing the weapon, under the theory of complicity he would be liable for the consequences of his actions." (Tr. 1483.)
{¶ 66} We review Friedman's testimony and related exhibits. Friedman was attending a barbeque at his friend Andre's house. He arrived at approximately 5:30 p.m., and the shooting took place at approximately 9 p.m. that evening.
{¶ 67} A substantial amount of testimony focused on the distances involved, characteristics of the street, houses, lots, and intersections. Reference is repeatedly made to a computer screen depicting these key facts, though they do not appear to be accessible to this court on review. This evidence was clearly relied on in the trial court's determination as the record reflects a number of questions regarding distance and proximity during Friedman's testimony, the witness whose testimony the trial court determined to be most persuasive.
*723 {¶ 68} "Generally, an appellate court may take judicial notice of any fact of which the trial court could have taken notice, even where the trial court failed to do so." Twinsburg v. Wesby , 9th Dist. Summit No. 25813, 2012-Ohio-569, 2012 WL 474004, ¶ 5, citing Day v. Day , 40 Ohio App.3d 155, 160, 532 N.E.2d 201, fn. 4 (10th Dist.1988).
{¶ 69} An appellate court has authority to take judicial notice regarding the characteristics of the streets of the jurisdiction. State v. Thomas , 11th Dist. Lake No. 92-L-020, 1993 WL 9719, 3, fn. 2 (Jan. 8, 1993), citing Day at fn. 4, Orose v. Hodge Drive-It-Yourself Co., Inc. , 132 Ohio St. 607, 9 N.E.2d 671 (1937) ; and Bonbright v. Biller , 67 Ohio App. 421, 421, 36 N.E.2d 173 (1st Dist.1941). "[W]e take judicial notice of a Google map and satellite image as a 'source[ ] whose accuracy cannot reasonably be questioned.' " Pahls v. Thomas , 718 F.3d 1210, 1216, fn. 1 (10th Cir.2013), quoting United States v. Perea-Rey , 680 F.3d 1179, 1182, fn. 1 (9th Cir. 2012) (second alteration in original) (quoting Fed.R.Evid. 201(b) ); see Citizens for Peace in Space v. Colorado Springs , 477 F.3d 1212, 1218, fn. 2 (10th Cir. 2007) (taking judicial notice of an online distance calculation that relied on Google Maps data).
{¶ 70} " 'Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial * * *.' " Id., quoting United States v. Piggie , 622 F.2d 486, 488 (10th Cir.1980). "See also David J. Dansky, The Google Knows Many Things: Judicial Notice in the Internet Era , 39 Colo. Law. 19, 24 (2010) ('Most courts are willing to take judicial notice of geographical facts and distances from private commercial websites such as MapQuest, Google Maps, and Google Earth.')." Pahls at id.
{¶ 71} "The Court may take judicial notice of Google Maps to determine distances and locations." Mitchell v. TVA, E.D.Tenn. No. 3:14-CV-360-TAV-HBG, 2015 WL 1962203, 1, fn. 1 (Apr. 30, 2015), citing Cloe v. Indianapolis , 712 F.3d 1171, 1177, fn. 3 (7th Cir.2013) ; Eden Isle Marina, Inc. v United States , 113 Fed.Cl. 372, 471, fn. 138 (2013), and Ryan v. TVA , E.D.Tenn. No. 3:14-CV-356-TAV-HBG, 2015 WL 1962173, 1, fn. 1 (Apr. 30, 2015).
{¶ 72} This court has also recognized the efficacy of Google Maps:
Similarly, Google Maps, and other satellite imaging programs, are generally considered to provide accurate and reliable measurements. In today's technologically savvy society, satellite imaging programs are used on a daily basis, and testimony concerning the use and output of such programs does not require information beyond the knowledge or experience possessed by most lay persons.
Dickerson v. Miller's TLC, Inc. , 8th Dist. Cuyahoga No. 96995, 2012-Ohio-2493, 2012 WL 2046505, ¶ 17.
{¶ 73} We therefore elect to employ Google Maps to take judicial notice of the East 92nd Street and Superior area pursuant to Evid.R. 201, which allows this court to take judicial notice regarding certain adjudicative facts:
The Staff Notes to Evid.R. 201 provide that the rule, "in its entirety, reflects existing Ohio practice and, except for the added clarifying language to subdivision (A) which is not intended to result in a contrary construction, is identical to Federal Evidence Rule 201." 1980 Staff Note, Evid.R. 201. The Advisory Committee Notes to Fed.R.Evid. 201 explain, "The usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of witnesses. If particular *724 facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary. A high degree of indisputability is the essential prerequisite." In accordance, a "judge may inform himself as to the facts of geography, such as the navigable character of a river, the distance between two points, or the location of a given place within the jurisdiction by resort to * * * public documents, maps, etc. "
(Emphasis added.) Wesby , 9th Dist. Summit No. 25813, 2012-Ohio-569, at ¶ 7, quoting State v. Burkhalter , 6th Dist. Lucas No. L-05-1111, 2006-Ohio-1623, 2006 WL 832677, ¶ 18, quoting State v. Scott , 3 Ohio App.2d 239, 243, 210 N.E.2d 289 (7th Dist.1965).
{¶ 74} Using the satellite layer and distance measurement feature of Google Maps, Friedman's location was 889.63 feet from the corner of East 92nd and Superior, over 296.54 yards or more than the length of two and one-half football fields at 120 yards each. (See map attached as Appendix A to this opinion.)[6] In addition to the approximately 12 houses, there are several vacant lots and trees. There is also a commercial building at the southwest corner of Superior. The barbeque activities were being held in the side lot on the southerly side of Andre's house, adjacent to Shipherd Avenue where the Charger ultimately turned right off of East 92nd Street.
{¶ 75} From the front steps of Andre's house by the sidewalk at 9:00 p.m., almost 300 yards (889.63 feet) down the street, Friedman saw a car chase involving a dark sedan and a Charger at the intersection of Superior and East 92nd Street. The dark sedan was shooting at the Charger, and the Charger turned right onto East 92nd Street. "The other car that was shooting at [the Charger], they shot and they kept going [on Superior]. The guy in the Dodge Charger, he appeared to just be trying to get away." (Emphasis added.) (Tr. 940.)
{¶ 76} "I mean, listen to me. There's a tree right in front of the house, the limbs on that tree was falling off because of what they were shooting." Friedman also added that "bullets were whizzing across our heads." Friedman told the other barbeque guests "[e]verybody get down. * * * That's the first time in my life I ever had bullets whiz across the top of my head." (Tr. 952-953.)
{¶ 77} The Charger was "[b]etween the corner [at Superior Avenue], and let's say that first house, from the corner," about 10 houses and several lots away, when Friedman saw a single "hand held out" of the back passenger window shooting a gun. The Charger "was trying to basically defend himself." (Tr. 941.) Friedman said he saw a hand shoot "a few times" back at the car that was returning fire." (Tr. 941.) Later, Friedman "assum[ed] half dozen maybe" shots were fired from the Charger instead of a few. (Tr. 947.)
{¶ 78} Friedman estimated that the occupants in the dark sedan on Superior shot at least 40 times, though he "couldn't see them because, you know, distance, but they took on just the, you know, image of cowboys, if you will. They were hanging out like windows [as] they were shooting." (Tr. 948.) The ballistics evidence was that the only shell casings found at the scene *725 were at the intersection of East 92nd Street and Superior Avenue, and all of them were sourced to the same individual.
{¶ 79} Though the dark sedan "shot and they kept going," Friedman could see that one of the sedan shooters had a "decent size long gun." (Tr. 940, 954.) Also from that distance, he could see the single hand, holding a "small handgun" out of the Charger's back passenger window. "It was just a bang, bang, bang, bang and let's get out of here." (Tr. 955.)
{¶ 80} Friedman then began walking north on East 92nd Street to see if anyone was injured since a number of people were outside when the shooting occurred. The Dodge Charger drove quickly past him and "wasn't menacing or anything like that. We couldn't see him. He was trying to get away." (Tr. 943.)
{¶ 81} Friedman's 911 call was brief, reporting a shooting and injuries. He stated his belief that two people had been shot, then said that a child had been shot in the hand and identified the child's location. During the call, Friedman attributed the shooting to a Dodge Charger but did not mention the sedan at all.
{¶ 82} Friedman could not see anyone in the Charger, but he "assumed that [there] was a driver, [and] unless the driver was Stretch Armstrong, [there] had to be a second person in the car." (Tr. 947.) He could see "[n]o shadows" when the Charger passed. (Tr. 948.) The windows were darkly tinted, and it was getting dark outside. "[B]y the time [the Charger] got to me, everybody in the car was laying down." (Tr. 955.)
{¶ 83} Friedman estimated the Charger's speed at 35 to 40 mph as it first made the right hand turn onto the street, then it accelerated but slowed down as it approached to make the right turn at Shipherd. Even with Friedman's distance from the actual shooting, the speed of the vehicle, number of shots being fired, the description of bullets whistling past him, distractions and ensuing darkness, Friedman testified to detailed observation about a single hand. "I'm going to tell you from the mere sound of it, the guys who were on Superior, they had way more guns." (Tr. 952.) "That's the first time in my life I ever had bullets whiz across the top of my head." (Tr. 953.)
{¶ 84} The ballistic evidence proved that the gun that shot E.J. on July 3, 2015, was listed in several NIBIN reports, including the shooting of appellant on May 17, 2015, and the drive-by shooting and firebombing of appellant's residence. The gun was recovered from Williams of the Broadway gang.
{¶ 85} In addition to the hand-out-of-the-back-passenger-window-from-almost-300-yards-away-past-trees-and-shrubs-with-bullets-whizzing-overhead-at-9:00 p.m. testimony, the trial court noted that the cell phone tower activity map indicated that appellant's cell phone and the Dodge Charger were at Superior at the time of the incident. Cell tower activity evidence has been permitted in Ohio to indicate that a cell phone was connected to a certain tower at a certain time.
{¶ 86} Typically, cell phone tower mapping by a lay person permits an inference to be drawn by the factfinder that the cell phone owner was in the area at the listed time, to corroborate other evidence of the defendant's presence at a crime scene. See , e.g. , State v. Wilson , 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980, 2017 WL 2293074 (defendant identified as shooter by victim who knew defendant and ballistic evidence present); State v. Daniel , 2016-Ohio-5231, 57 N.E.3d 1203 (8th Dist.) (Charges included three brutal rapes of three victims. Defendant was found guilty of most charges and pleaded guilty to rape *726 and related charges of one victim); Dunn, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138 (defendant knew the victim, identification testimony was offered, and guilt inferences about cell phone evidence comments by the state during closing arguments were not assigned as reviewable error).
{¶ 87} We reiterated in Wilson , which followed our decision in Daniel[7] (adopting a line of federal case law), that the " 'potential problems with estimating a cell phone's location based on phone records' goes to the weight of the cellular testimony not its reliability." Wilson at ¶ 33, quoting Daniel at ¶ 70. In the instant case, there is a Charger, a cell phone map, a single individual reporting a hand shooting from a rear passenger window from an appreciable distance at 9:00 p.m., with bullets flying overhead and no identification of a single person, or the number of individuals, in the Charger.
{¶ 88} Appellant argued during trial, and advised the trial court prior to sentencing, that he never owned a gun and did not like guns. The more than 800 social media posts of appellant reflected no gang activity whatsoever, only family activities with his children and brother Larry.
{¶ 89} Booker, admittedly part of Fleet, testified that he "hung out" with Bradley and other members of Fleet but that appellant did not hang out in the streets with them. Appellant was "different than the other ones." (Tr. 584.) Appellant was never involved in discussions about shooting or retaliating, and spent most of his time with his children and caring for Larry. Booker never knew appellant to use guns or talk about having guns. (Tr. 668-669.)
{¶ 90} No weapons were attributed to appellant in either case before the trial court. No bullet casings were traced to appellant. In fact, in spite of Friedman's testimony that there were guys hanging out of the sedan windows shooting at least 40 times, though they shot and kept going, the only ballistic evidence was located at the corner of Superior and East 92nd Street and traced back to Williams. The evidence supports the presence of an automobile and a cell phone, but not of specific individuals.
{¶ 91} The trial court heard three weeks of testimony by numerous witnesses in the consolidated bench trial. Much of the evidence related to charges that did not involve appellant or where appellant was actually the victim. In the Gang Case , the trial court specifically rejected the state's position that appellant was engaged in gang activity and he was exonerated of all charges.
{¶ 92} It is true that where a principle's identity is not an element of a crime, the state is not required to establish the principal's identity to convict an offender of complicity. In re T.K. , 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13 :
Rather, "[to] support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v. Johnson , 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. Such criminal intent can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed. Id. at 245 [754 N.E.2d 796].
Id.
{¶ 93} Even in light of the strict liability status of R.C. 2923.162(A)(3), unlike the *727 instant case, the disputed facts in T.K. did not involve the presence of the (1) defendant, (2) principal, or (3) gun. We also consider whether appellant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime." Id. This is particularly challenging where there is a question of whether the appellant was even present.
{¶ 94} Under a sufficiency analysis, we consider whether the trial court's belief of the evidence would support a finding of the essential elements of a crime proven beyond a reasonable doubt. Thompkins, 78 Ohio St.3d at 386, 678 N.E.2d 541. The evidence supports the presence of the Charger, but no evidence supports that appellant was in the Charger. The cell phone tower evidence allowed an inference that the cell phone was in certain geographical areas, but did not prove that appellant was in possession of the cell phone at that time.
{¶ 95} The state offered that the cell phone photographs allegedly taken, or modified, or accessed, on the morning of July 3, 2015, demonstrated possession. That evidence does not prove who took the photographs or whether, assuming they were taken by appellant, the cell phone was in appellant's presence that night.
{¶ 96} Neal was the registered owner of the Charger, as she was for the SUV driven by another son that she forfeited as part of her plea. There is no evidence that appellant had sole access to the Charger. Based on the record, the family members, including Bradley and Black, had access to the vehicles owned by Neal, such as the black SUV forfeited by Neal in the Gang Case.
{¶ 97} The trial court determined in the Gang Case that the evidence "did not establish, beyond a reasonable doubt, that Maurice Bradford was a participant in the criminal gang. The state's own witnesses suggested otherwise." (Tr. 1488.) As a result, the trial court concluded that "Mr. Maurice Bradford is not guilty" of participating in a criminal gang. Id.
{¶ 98} The trial court impressively handled a daunting task, involving three weeks of testimony from 20 witnesses, several who testified under plea agreements. The trial court deftly entertained hundreds of exhibits and adjudicated numerous evidentiary objections involving two consolidated cases with multiple defendants in one case, one of whom was also the sole defendant in the other.
{¶ 99} We find that even when viewed in a light most favorable to the prosecution, the evidence is insufficient as a matter of law to support the verdict in this case. Accepting that the Charger and a cell phone were present at Superior and the sole witness saw a single hand shoot a small gun from a back seat car window from a block away at 9:00 p.m. in the midst of the melee described by Friedman, the evidence is insufficient to support the presence of appellant at Superior, which subsumes the theories of complicity, aiding, and abetting. This analysis also serves to reverse the finding on the charge of having a weapon while under disability 2923.13(A)(3).
{¶ 100} In addition to sufficiency, choosing to further address the manifest weight issue, the analysis set forth herein also serves as the foundation of our finding that, sitting as a thirteenth juror and considering whether the "greater amount of credible evidence" supports the conviction, the verdict is against the manifest weight of the evidence. Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541.
{¶ 101} Coupled with the evidence underlying our finding of insufficiency, the trial court acknowledged that the weight of *728 the evidence supported: (1) Broadway was the aggressor at Superior, (2) the state failed to demonstrate that appellant was involved with gang activities, (3) appellant was not known to carry a gun, hang out with gang members, or to engage in discussions of gang retaliation for shootings by Broadway, even after he was shot, all as supported by the state's own witness and evidence, and (4) that the cell mapping, which goes to the weight of the evidence, does not demonstrate that appellant was personally present at Superior.
IV. Conclusion.
{¶ 102} For the foregoing reasons, we find that the evidence was insufficient and against the manifest weight to sustain the convictions in this case, rendering the remaining assignments of error moot. App.R. 12(A). Appellant's convictions are ordered vacated, and appellant is ordered discharge from prison.
{¶ 103} Judgment vacated.
LARRY A. JONES, SR., J., CONCURS;
FRANK D. CELEBREZZE, JR., J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION
FRANK D. CELEBREZZE, JR., J., CONCURRING IN JUDGMENT ONLY:
{¶ 104} While I concur with the majority's resolution of appellant's fifth assignment of error and determination that there was insufficient evidence to support appellant's convictions for discharging a firearm on or near prohibited premises and having a weapon while under disability, I respectfully disagree with the holding that the evidence is insufficient to support the presence of appellant at Superior Avenue at the time of the incident. In my view, the state's evidence, if believed, establishes that appellant was in the area where the shooting took place. However, I believe that the state failed to establish that appellant was inside the Charger.
{¶ 105} The July 3 shooting took place at approximately 9:00 p.m. at East 92nd Street and Superior Avenue. Cleveland Police Department Crime Analyst Wiles testified that appellant's cell phone connected with a cell tower at East 100th Street and Superior Avenue at 9:08 p.m. The record reflects that the cell tower with which appellant's cell phone connected is approximately 2/10 of a mile from the location that the shooting took place. Although Wiles's testimony, if believed, establishes that appellant was in the general area that the shooting took place, it does not establish that appellant was inside the Charger, much less that he had a firearm in his possession or fired any shots from inside the Charger.
{¶ 106} Cleveland Police Detective Reese testified about an incident that occurred a few years ago during which appellant flagged him down in the Broadway neighborhood after the Charger had been carjacked. Detective Reese explained that when appellant flagged him down, "one of his brothers may have been there." (Tr. 1102-1103.) After Detective Reese spoke with appellant and his brother, he drove them home. Detective Reese's testimony, if believed, establishes at best that appellant had access to and either drove or rode in the Charger on a prior occasion. His testimony does not establish, however, that appellant was inside the Charger during the July 3 shooting.
{¶ 107} There was no eyewitness testimony or physical evidence establishing that appellant was, in fact, inside the Charger during the shootout. The Charger was registered to appellant's mother, codefendant Neal. There is no evidence that appellant was the only person that drove or had access to the Charger. In fact, the *729 record reflects that appellant's codefendant brothers, Bradley Bradford and Lawrence Black, also had access to the Charger. Accordingly, I find that the state failed to establish that appellant was inside the Charger during the shoot out, much less that appellant had a weapon and fired any shots from inside the vehicle. Therefore, I would sustain appellant's fifth assignment of error and vacate appellant's convictions.
{¶ 108} In my view, appellant's sixth assignment of error is moot and we need not address whether appellant's convictions are against the manifest weight of the evidence. For all of these reasons, I respectfully concur in judgment only.

The sentence included a concurrent six-month sentence related to State v. Bradford , Cuyahoga C.P. No. CR-14-584927, for a fifth-degree felony, discussed briefly herein.

Sentencing was unduly delayed as Bradley was a codefendant in the drug case. Bradley was charged in another case, and the prosecution did not want to resolve appellant's drug case until Bradley's new case was resolved. The trial court placed appellant on court-supervised release from May 9, 2014, through the time of his arrest in the instant case on August 19, 2015. Appellant reported several times per month and had no issues except for a single positive test result for alcohol. (Tr. 1527.)

In Dunn, the cellular company representative described the content of the cell records, the cell tower identification numbers, the beginning and ending of the calls by cell tower number, and from which direction the tower "pinged." A criminal intelligence analyst testified about a map she created based on that information. There was no testimony about how pinging worked "and no witness testified about" the defendant's "location at the time of the murder 'by means of" tower location and mapping." Id. at ¶ 45. Speculation or inferences about defendant's location "was established by the state" during the closing argument. Id. The question of whether the state's comments constituted "evidence outside of the record" was not before the court. Id.

Casings from the weapon linked to Williams were also located at the May 17, 2015 shooting of appellant, the scene of the drive-by shooting and firebombing of appellant's family home, the Scovill shootings, and the July 8, 2015 shooting of Bradley who was seriously injured. (Tr. 1172.)

The state's rebuttal was to point out a July 15, 2015 Instagram post by appellant with a picture of his brother Bradley and their friend, Donique Williams, who was in federal prison at the time. Donique and Bradley were with Fleet, according to Det. Johnson. The text accompanying the picture indicated that appellant talked with Williams on the telephone. "He said he love[s] me and I said I love my * * * back." "Larry [Bradford] goin[g] to walk again." "I love my bras [sic]." (Tr. 1353.) Larry is the paralyzed brother. (Tr. 1357.)

"An appendix to our opinion contains a helpful map of the site. The parties unfortunately did not provide us a map." Pahls , 718 F.3d 1210, 1216, fn. 1. "We do this here only to determine the 'general location' of relevant events." Id. , citing United States v. Perea-Rey , 680 F.3d 1179, 1182, fn. 1 (9th Cir.2012). "The map in the appendix" is "based on Google Maps' 'Distance Measurement Tool.' " Id. , comparing Citizens for Peace in Space v. Colorado Springs , 477 F.3d 1212, 1218, fn. 2 (10th Cir.2007).

Det. Wiles also provided the cell phone tower mapping evidence in Daniel .