Hoover, P.J.
{¶1} Defendant-appellant, Inielsis Guillot Isaac ("Isaac"), appeals from the Meigs County Court of Common Pleas judgment, which convicted him of possession of drugs and trafficking in drugs and sentenced him to eleven years of incarceration and a $20,000 fine. According to Isaac, the trial court erred in refusing to take judicial notice of the exact location of the boundary line between Ohio and West Virginia on the Ravenswood Bridge, in denying Isaac's motion to suppress, and in imposing a fine of $20,000. The State argues that Isaac failed to provide the information necessary for the trial court to take judicial notice, that the trial court did not err in denying Isaac's motion to suppress, and that Isaac failed to demonstrate that he is indigent.
{¶2} Upon careful review, although we find that the trial court did not err in refusing to take judicial notice, we do find that the trial court did err in denying Isaac's motion to suppress. Accordingly, we overrule Isaac's first assignment of error; but we sustain his second assignment of error. Isaac's third assignment of error is moot. Therefore, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.
I. Facts and Procedural History
{¶3} On June 17, 2017, Isaac was driving down W.Va. Route 68 in Ravenswood, Jackson County, West Virginia. That day, Officer Andrew R. Boggess ("Officer Boggess") of the Ravenswood Police Department was parked in Ravenswood, West Virginia, where W.Va. Route 68 joins with U.S. Route 33. Officer Boggess testified that he observed Isaac as he drove past. According to Officer Boggess, Isaac had an "adrenaline rush look to his face," which, based on his training and experience, was a criminal indicator. At that point, Officer Boggess pulled out onto W.Va. Route 68 and followed Isaac as he made his way onto U.S. Route 33.
{¶4} Once behind Isaac, Officer Boggess observed that the license bracket on Isaac's vehicle obscured his license plate. In West Virginia, license plate obstruction is a citable offense. Officer Boggess continued to follow Isaac as he made his way onto the William M. Ritchie, Jr. Bridge ("Ravenswood Bridge"), which crosses the Ohio River and connects Jackson County, West Virginia to Meigs County, Ohio. Officer Boggess testified that he observed Isaac commit a second traffic violation while turning onto the bridge. According to Officer Boggess, Isaac's vehicle went left of center and crossed the double yellow line. Thereafter, while both vehicles were still on the bridge, Officer Boggess activated his emergency lights and sirens. Isaac complied and safely pulled his vehicle *354 over on the right-hand shoulder once he had exited the bridge into Meigs County, Ohio.
{¶5} After approaching Isaac's vehicle, Officer Boggess asked Isaac for his license, registration, and proof of insurance. Isaac provided those materials to Officer Boggess. During this exchange, Officer Boggess observed that Isaac was presenting criminal indicators, such as shaking and avoiding eye contact. By that time, a back-up officer had arrived on the scene. Boggess asked the officer to run a license check, an insurance check, a registration check, and a warrant check.
{¶6} Officer Boggess returned to the passenger side of Isaac's vehicle and asked him to step out. Isaac complied and exited the vehicle. Officer Boggess then conducted a pat-down of Isaac and determined that he was not carrying any weapons. Officer Boggess testified that next he asked Isaac for consent to search the vehicle. According to Officer Boggess, Isaac consented to the search and was advised that he could stop the search at any time. Officer Boggess then proceeded to search the vehicle and found what he suspected to be heroin. that time, Officer Boggess contacted the Meigs County Sheriff's Office, who subsequently took Isaac into custody.
{¶7} On July 12, 2017, the Meigs County Grand Jury issued a two-count indictment charging Isaac with Count 1: Possession of Drugs, a first degree felony in violation of R.C. 2925.11(A) & (C)(6)(f) ; and Count 2: Trafficking in Drugs, a first degree felony in violation of R.C. 2925.03(A)(2) & (C)(6)(g). Isaac was arraigned on the charges on July 19, 2017, where he was appointed counsel and entered not guilty pleas.[1]
{¶8} On August 7, 2017, Isaac filed a motion to suppress evidence followed by a motion for judicial notice of adjudicative facts filed on September 14, 2017. The trial court issued an order on October 10, 2017, which overruled Isaac's motion to suppress and denied his motion for judicial notice. According to the trial court, Officer Boggess had statutory authority under R.C. 2935.03(D) and (E)(3) to arrest Isaac in Ohio. Additionally, the trial court found that West Virginia's jurisdiction extends to the low water mark on the Ohio side of the Ohio River.
{¶9} On November 13, 2017, Isaac withdrew his not guilty pleas and entered a plea of no contest to both counts. Isaac also provided an affidavit of indigency on November 13, 2017. Thereafter, the trial court sentenced Isaac to eleven years of incarceration and ordered him to pay a $20,000 fine.
II. Assignments of Error
{¶10} On appeal, Isaac assigns the following errors for our review:
Assignment of Error I:
The trial court erred as a matter of law when it determined that West Virginia's "jurisdiction extends to the low water mark of Ohio's shore." (October 10, 2017 Order, p.2).
Assignment of Error II:
The trial court erred in overruling Isaac's motion to suppress. (Order, October 10, 2017).
Assignment of Error III:
The trial court abused its discretion when it imposed a mandatory fine of $20,000.00. (Judgment Entry, November 17, 2017[ ] ).
*355 III. Law and Analysis
A. The Trial Court Did Not Err in Determining that West Virginia's Jurisdiction Extends to the Low Water Mark of Ohio's Shore
{¶11} In his first assignment of error, Isaac contends that the trial court erred in refusing to take judicial notice of the exact location of the boundary line between Ohio and West Virginia on the Ravenswood Bridge. Isaac alleges that the trial court should have held that the "Sand Creek Bar" marks the Ohio-West Virginia boundary on the Ravenswood Bridge. The State argues that Isaac failed to supply sufficient information for the trial court to take judicial notice of the exact location of the boundary line between Ohio and West Virginia.
{¶12} Evid.R. 201 governs judicial notice of "adjudicative facts," i.e., the facts of the case. Evid.R. 201(A). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). A court must take judicial notice if requested by a party and supplied with the necessary information that would allow it to do so. Evid.R. 201(D). Otherwise, it is within the trial court's discretion to take judicial notice. Evid.R. 201(C).
{¶13} Geography is particularly susceptible to judicial notice because geographic locations are generally noncontroversial facts. United States v. Piggie , 622 F.2d 486, 488 (10th Cir.1980) ; State v. Gray , 4th Dist. Ross No. 97CA2284, 1998 WL 103325, at *2 (Feb. 19, 1998). In taking judicial notice of a geographical fact, a court may rely upon sources like public documents and maps. State v. Elliott , 4th Dist. Ross No. 06CA2924, 2007-Ohio-2178, 2007 WL 1323434, ¶ 14 ; see 31 Corpus Juris Secundum, Evidence, Section 12, at 733-735. Many courts "take judicial notice of a Google map [or] satellite image as a 'source[ ] whose accuracy cannot reasonably be questioned[.]' " Pahls v. Thomas , 718 F.3d 1210, 1216 (10th Cir.2013), fn. 1, citing United States v. Perea-Rey , 680 F.3d 1179, 1182 (9th Cir.2012), fn. 1; see State v. Bradford , 2018-Ohio-1417, 101 N.E.3d 710, ¶ 69 (8th Dist.). However, some courts only use Google maps to take judicial notice of the "general location" of an event or geographical fact. See Pahls at 1216, fn. 1 ; Perea-Rey at 1182, fn. 1 ; Bradford at ¶ 74, fn. 6.
{¶14} In the case sub judice , Isaac provided the trial court a Google map of the Ohio-West Virginia border at the final pre-trial hearing held August 23, 2017. Attached to his motion for judicial notice of adjudicative facts, Isaac also provided the trial court with maps from a 2001 contract between the Ohio Department of Transportation ("ODOT") and the West Virginia Department of Transportation. Based on these documents, Isaac alleges that the state boundary line between Ohio and West Virginia is approximately one quarter of the way through the Ravenswood Bridge, heading west. Isaac also argues that the boundary line follows the contour of the Sand Creek Bar.
{¶15} The trial court refused to specify the Ohio-West Virginia boundary line in relation to the Ravenswood Bridge based on the maps Isaac provided. Instead, the trial court simply held that the true boundary line between Ohio and West Virginia was "the low water mark on the northwest or Ohio side of the Ohio River."[2] In support *356 of its finding, the trial court relied upon longstanding case law. See Handly's Lessee v. Anthony , 18 U.S. 374, 385, 5 Wheat. 374, 5 L.Ed. 113 (1820) ; Ward v. Island Creek Fuel & Transp. Co. , 261 F.Supp. 810, 813 (1966), fn. 11 ; State v. Faudre , 54 W.Va. 122, 135-136, 46 S.E. 269 (1903) (Dent., J., concurring) ("[The Supreme Court of the United States] has already determined the boundary between this State and the North Western territory ceded to the United States by the State of Virginia, including the State of Ohio, to be low water mark on the Ohio side.").
{¶16} Upon review, we find that the maps that Isaac provided are sources whose accuracy can reasonably be questioned. The boundary line depicted in the Google map at one point runs through Ohio soil. This is irreconcilable with the established case law, which holds that Ohio's jurisdiction reaches to the low water mark on the Ohio side of the Ohio River. Additionally, it is uncertain whether the maps attached to the ODOT contract contain the actual boundary line between Ohio and West Virginia or a boundary with coordinates established solely for the purposes of this contract. The contract only states that the depicted boundary line "shall be considered as the boundary line between the States of West Virginia and Ohio." (Emphasis added.) Further, even if the ODOT contract accurately reflected the low water mark as it was in 2001, Isaac has failed to provide any proof that the low water mark had not changed from 2001 until the time of the offense in 2017. See Al Johnson Const. Co. v. Kosydar , 42 Ohio St.2d 29, 34, 325 N.E.2d 549 (1975), fn.3 ("[O]ver the years the low water mark has changed.").
{¶17} We find that Isaac failed to provide information from sources whose accuracy cannot reasonably be questioned. Therefore, the trial court was not required to take judicial notice of the exact location of the boundary line between Ohio and West Virginia on the Ravenswood Bridge.[3]
{¶18} Accordingly, we overrule Isaac's first assignment of error.
B. The Trial Court Erred in Denying Isaac's Motion to Suppress
{¶19} In his second assignment of error, Isaac contends that the trial court erred in denying his motion to suppress. Isaac argues, in pertinent part, that (1) Officer Boggess did not have the statutory authority to conduct an extraterritorial traffic stop for a misdemeanor offense; and (2) the State failed to prove by clear and convincing evidence that Isaac consented to the search of his vehicle. Consequently, Isaac argues that Officer Boggess violated his right under Article I, Section 14 of the Ohio Constitution to be free of unreasonable searches and seizures.
{¶20} In response to Isaac's arguments, the State asserts that (1) the trial court *357 correctly found that Officer Boggess had statutory authority under R.C. 2935.03(D) and (E)(3) to conduct a traffic stop outside his jurisdiction; and (2) it established by clear and convincing evidence that Isaac's consent was freely and voluntarily given. Therefore, the State argues that Officer Boggess did not violate Article I, Section 14 of the Ohio Constitution.
{¶21} "Appellate review of a motion to suppress presents a mixed question of law and fact." State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Fanning , 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if they are supported by competent, credible evidence. State v. Dunlap , 73 Ohio St.3d 308, 314, 652 N.E.2d 988 (1995) ; State v. Long , 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998) ; State v. Medcalf , 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). The reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. State v. Fry , 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, 2004 WL 2428439, ¶ 16, citing State v. Featherstone , 150 Ohio App.3d 24, 2002-Ohio-6028, 778 N.E.2d 1124, ¶ 10 (10th Dist.).
{¶22} Statutory interpretation, however, is a question of law subject to de novo appellate review. State v. Sufronko , 105 Ohio App.3d 504, 506, 664 N.E.2d 596 (4th Dist.1995).
{¶23} Courts do not have authority to ignore the plain and unambiguous language of a statute under the guise of statutory interpretation, but, rather, in such situations the courts must give effect to the words used. Ohio Neighborhood Fin., Inc. v. Scott , 139 Ohio St.3d 536, 2014-Ohio-2440, 13 N.E.3d 1115, ¶ 34, citing State ex rel. Wolfe v. Delaware Cty. Bd. of Elections , 88 Ohio St.3d 182, 186, 724 N.E.2d 771 (2000) and State v. Krutz , 28 Ohio St.3d 36, 38, 502 N.E.2d 210 (1986). Absent ambiguity, statutory language is not to be enlarged or construed in any way other than that which its words demand. Bartley v. State , 4th Dist. Pike No. 02CA686, 2002-Ohio-3592, 2002 WL 1560899, ¶ 33, citing Kneisley v. Lattimer-Stevens Co. , 40 Ohio St.3d 354, 357, 533 N.E.2d 743 (1988).
{¶24} R.C. 2935.03(A) empowers peace officers, within their jurisdiction, to make warrantless arrests for Ohio crimes. R.C. 2935.03(D) enlarges that arrest power, stating in pertinent part that:
If a * * * peace officer * * * is authorized by division (A) or (B) of this section to arrest and detain, within the limits of the political subdivision * * * in which the officer is * * * employed * * *, a person until a warrant can be obtained, the peace officer, outside the limits of that territory, may pursue, arrest, and detain that person until a warrant can be obtained if all of the following apply:
(1) The pursuit takes place without unreasonable delay after the offense is committed;
(2) The pursuit is initiated within the limits of the political subdivision * * * of the peace officer;
(3) The offense involved is * * * [an] offense for which points are chargeable pursuant to section 4510.036 of the Revised Code.
R.C. 2935.03(E)(3) also enlarges the arrest power of certain peace officers, who "may arrest and detain, until a warrant can be obtained, any person found violating any *358 section or chapter of the Revised Code listed in division (E)(1) of this section on the portion of any street or highway that is located immediately adjacent to the boundaries of the municipal corporation in which the * * *officer * * * is * * * employed."
{¶25} A "peace officer," under this chapter of the Revised Code, includes "a sheriff; deputy sheriff; marshal; deputy marshal; member of the organized police department of any municipal corporation, including a member of the organized police department of a municipal corporation in an adjoining state serving in Ohio under a contract pursuant to section 737.04 of the Revised Code ; * * *" (Emphasis added.) R.C. 2935.01(B).
{¶26} Because R.C. 2935.01(B) contains no ambiguity, we must give effect to the statute as written. Although the definition of "peace officer" includes a "member of the organized police department of any municipal corporation," that language cannot be read in isolation. (Emphasis added.) R.C. 2935.01(B). The plain language of R.C. 2935.01(B) excludes members of police departments from adjoining states from the definition of "peace officer," as used in Chapter 2935 of the Revised Code, unless they are "member[s] of the organized police department of a municipal corporation in an adjoining state serving in Ohio under a contract pursuant to section 737.04 of the Revised Code [.]" (Emphasis added.) R.C. 2935.01(B). Therefore, the only foreign police officers that have jurisdiction under R.C. 2935.03(D) and R.C. 2935.03(E)(3) to make an arrest in Ohio are peace officers of municipal corporations in adjoining states serving in Ohio under a contract pursuant to R.C. 737.04.
{¶27} Here, because there is no evidence in the record that Officer Boggess was serving in Ohio under a contract pursuant to R.C. 737.04, we cannot find that Officer Boggess was a "peace officer" under R.C. 2935.01(B). Furthermore, we can find no other section of the Revised Code that grants him the statutory authority to pursue and stop Isaac's vehicle in Ohio. Thus, we conclude that Officer Boggess did not have the statutory authority to conduct an extraterritorial traffic stop for a misdemeanor offense in Ohio. Next, we turn to the constitutionality of the search.
{¶28} The Fourth Amendment to the United States Constitution protects individuals against unreasonable governmental searches and seizures. United States v. Arvizu , 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures" is also guaranteed by Article I, Section 14 of the Ohio Constitution.
{¶29} The Ohio Supreme Court has held that " Article I, Section 14 of the Ohio Constitution affords greater protection than the Fourth Amendment against searches and seizures conducted by members of law enforcement who lack authority to make an arrest." State v. Brown , 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496, ¶ 23 ; see also State v. Brown , 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175, ¶ 22. To ascertain whether a search or seizure is reasonable, courts use the balancing test set forth in State v. Jones , 88 Ohio St.3d 430, 727 N.E.2d 886 (2000). This involves "weighing the competing interests involved and considering the extent of the officer's intrusion on an individual's liberty and privacy against the need to promote legitimate governmental interests." Brown , 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496 at ¶ 23, citing Brown , 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175 at ¶¶ 17-19 and Jones at 437, 727 N.E.2d 886.
*359 {¶30} In State v. Brown , a Lake Township patrol officer stopped Brown on Ohio's Interstate 280 after his vehicle crossed the solid white fog line for approximately one hundred feet. State v. Brown , 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496 at ¶ 4. During the traffic stop, the officer walked a drug dog around Brown's vehicle and discovered 120 oxycodone tablets and marijuana. Id. at ¶ 5. However, the officer had no statutory authority to conduct the traffic stop. Id. at ¶ 4. R.C. 4513.39(A) grants state highway patrol and county sheriffs or their deputies the exclusive authority to make arrests on interstate highways for the traffic offenses enumerated in the statute. See id. at ¶ 17, citing State v. Holbert , 38 Ohio St.2d 113, 311 N.E.2d 22 (1974), paragraph two of the syllabus. Although the statute contains exceptions for certain township police officers, the officer in Brown did not fall into one of the statute's exceptions and thus was precluded from enforcing traffic laws on state highways. See 4513.39(B); Brown , 143 Ohio St.3d 444, 2015-Ohio-2438, 39 N.E.3d 496 at ¶ 4 ("It is undisputed that [the officer] lacked authority to stop a motorist for a marked lane violation on an interstate highway.").
{¶31} Using the Jones balancing test, the Ohio Supreme Court found that "[t]he government's interests in permitting an officer without statutory jurisdiction or authority to make a traffic stop for a minor misdemeanor offense in these circumstances is minimal and is outweighed by the intrusion upon the individual's liberty and privacy that necessarily arises out of the stop." Id. at ¶ 25. Therefore, the Court found that the traffic stop and subsequent search and arrest were unreasonable and violated Article I, Section 14 of the Ohio Constitution, and the evidence seized as a result should have been suppressed. Id.
{¶32} Similar to the facts in Brown , Officer Boggess stopped Isaac for minor traffic violations: an obscured license plate and a marked lane violation. We have already determined that Officer Boggess, a member of the Ravenswood Police Department in Ravenswood, West Virginia, did not have the statutory authority to conduct the traffic stop at issue, which ultimately occurred in Meigs County, Ohio. Although R.C. 2935.03(D) and (E)(3) permit certain peace officers to make warrantless arrests outside their jurisdiction for certain offenses, including traffic violations, Officer Boggess does not meet the definition of "peace officer" found in R.C. 2935.01(B). Therefore, Officer Boggess's traffic stop constituted an illegal detention.
{¶33} However, "[v]oluntary consent * * * may validate an otherwise illegal detention and search if the consent is an 'independent act of free will.' " State v. Davis , 2016-Ohio-3539, 67 N.E.3d 33, ¶ 34 (4th Dist.), quoting State v. Fry , 4th Dist. No. 03CA26, 2004-Ohio-5747, 2004 WL 2428439, ¶ 19. "For an unlawfully detained individual's consent to be considered an independent act of free will, 'the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave.' " Id. , quoting State v. Robinette , 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (1997). "This is an objective test, and the proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " Id. , quoting Florida v. Bostick , 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
{¶34} "Whether an individual voluntarily consented to a search is a question of fact, not a question of law." State v. Fry , 4th Dist. No. 03CA26, 2004-Ohio-5747, 2004 WL 2428439, ¶ 21, citing *360 Ohio v. Robinette , 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (" Robinette I "); see also Schneckloth v. Bustamonte , 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, an appellate court reviews a trial court's finding that the defendant voluntarily consented to the search under the weight of the evidence standard. Fry at ¶ 22. "Even though the state's burden of proof is 'clear and convincing,' this standard of review is highly deferential and the presence of only 'some competent, credible evidence' to support the trial court's finding requires us to affirm it." Id. , citing State v. Schiebel , 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).
{¶35} "[A]n individual's knowledge of the right to refuse consent 'is not a prerequisite of a voluntary consent.' " Fry , 2004-Ohio-5747 at ¶ 24, quoting Schneckloth at 234, 93 S.Ct. 2041. " 'The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.' " Id. , quoting United States v. Drayton , 536 U.S. 194, 206, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), citing Ohio v. Robinette , 519 U.S. 33, 39-40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (" Robinette I "). "Rather, it must be determined if a person felt compelled to submit to the officer's questioning in light of the police officer's superior position of authority." Id. , citing Robinette II at 244-245, 685 N.E.2d 762.
{¶36} In Robinette II , the Ohio Supreme Court determined that consent was not freely and voluntarily given based on the totality of the circumstances. In that case, the officer stopped Robinette's vehicle for speeding. After obtaining Robinette's license and verifying its validity, the officer returned to Robinette's vehicle and asked him to exit the vehicle and walk to the rear of Robinette's car, which was parked in front of the patrol car. The officer returned to his patrol car and turned on a video camera. The officer then approached Robinette, issued a verbal warning regarding Robinette's speed, and returned Robinette's driver's license. Then, and without any break in the conversation, the officer asked Robinette, "One question before you get gone [sic]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" Robinette II at 243, 685 N.E.2d 762. According to the officer, as part of the drug interdiction project, he routinely asked permission to search the cars he stopped for speeding violations. After Robinette denied having any contraband in the car, the officer immediately asked Robinette if he could search the vehicle. "Robinette hesitated, looked at his car, then back at the officer, then nodded his head." Id. The officer searched Robinette's car and seized marijuana and methylenedioxy methamphetamine ("MDMA").
{¶37} The Robinette court was troubled by the timing of the officer's immediate transition from giving Robinette the warning for speeding into requesting to search the vehicle. Id. at 244, 685 N.E.2d 762. As the Ohio Supreme Court observed in Robinette I:
The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to.
State v. Robinette, 73 Ohio St.3d 650, 654, 653 N.E.2d 695 (1995) ; see also Robinette II at 244, 685 N.E.2d 762.
{¶38} In Robinette II , the Ohio Supreme Court expanded on its observation, stating:
*361 When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While [the officer's] questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. Even the State conceded, at an oral argument before the United States Supreme Court, that an officer has discretion to issue a ticket rather than a warning to a motorist if the motorist becomes uncooperative. * * * From the totality of the circumstances, it appears that Robinette merely submitted to "a claim of lawful authority" rather than consenting as a voluntary act of free will.
Robinette II at 244-245, 685 N.E.2d 762.
{¶39} After careful review, we find no legal distinction between Robinette and the case before this Court. Like the Supreme Court in Robinette , we take issue with the timing of Officer Boggess's request to search Isaac's vehicle.
{¶40} After asking Isaac for his license and running his information, Officer Boggess asked Isaac to exit his vehicle and conducted a frisk. Officer Boggess testified that he requested to search Isaac's vehicle sometime during or immediately after the frisk, while Isaac was still outside of his vehicle. Even though Officer Boggess testified that he asked for Isaac's consent to search the vehicle and informed Isaac of his right to stop the search at any time, the fact remains that the request occurred while Isaac was still detained. "Normally, [a traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." Arizona v. Johnson , 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Officer Boggess had not issued a verbal warning or a ticket before he requested to search Isaac's vehicle.
{¶41} Where we have previously found that a defendant voluntarily consented to a search of his vehicle after an illegal detention, a clear end to the detention existed before the subsequent request to search the vehicle. Compare State v. Davis , 2016-Ohio-3539, 67 N.E.3d 33 at ¶ 48 (officer issued a warning and told Davis she was "free to go" before requesting to search Davis's vehicle); State v. Fry , 2004-Ohio-5747 at ¶ 25 (trooper issued a warning and advised Fry that he was "free to leave" before he requested to search Fry's vehicle).
{¶42} Here, there was no transition between the detention and the request to search. Officer Boggess testified that he had not issued a warning or a ticket before asking Isaac to exit his vehicle:
Q. So at that point you, you could have issued him a ticket or a warning and you chose not to? Am I correct?
A. When I first approached the vehicle?
Q. Well when you got through all his paperwork. You could have issued him a citation or a warning and you chose not to, am I correct?
A. Could have, correct.
Q. And you chose rather to get him out of the car and frisk him?
A. Correct.
Besides issuing a warning or ticket, Officer Boggess did not otherwise convey to Isaac that the traffic stop had ended before he requested to search Isaac's vehicle.
{¶43} After considering the totality of the circumstances, we cannot find that Isaac would have believed at the time that he was free to get in his car and drive away. See State v. Prater , 2012-Ohio-5105, 984 N.E.2d 36, ¶¶ 21-22 (2d Dist.). Under *362 these circumstances, any reasonable person would have felt compelled to submit to the officer's search, rather than consent as a voluntary act of free will.
{¶44} Since we found that Isaac did not voluntarily consent to the illegal detention, we now return to the Jones balancing test. After weighing the competing interests, we find, like the Court in Brown , that the stop and search of Isaac's vehicle was unreasonable and violated his rights under Article I, Section 14 of the Ohio Constitution. The intrusion upon Isaac's liberty outweighed the government's interest in allowing an officer without statutory authority to make a traffic stop for misdemeanor offenses. Even though now we are aware that Isaac was transporting contraband which would result in a felony charge, our constitutional analysis is limited to the facts known by Officer Boggess prior to the stop and search.
{¶45} We do not reach this decision lightly. As judges we took an oath to support the constitutions of Ohio and of the United States. Therefore, we must uphold the Fourth Amendment to the United States Constitution's protection of individuals against unreasonable governmental searches and seizures. Likewise, we must also follow Article I, Section 14 of the Ohio Constitution, which affords even greater protection than the Fourth Amendment against searches and seizures conducted by members of law enforcement who lack authority to make an arrest.
{¶46} Given the facts and circumstances of this case, we find that the trial court erred in denying Isaac's motion to suppress. Consequently, we sustain Isaac's second assignment of error.
IV. Conclusion
{¶47} Based on the foregoing reasons, we overrule Isaac's first assignment of error and sustain Isaac's second assignment of error. Our resolution of Isaac's second assignment of error renders his third assignment of error moot. Hence, we need not address Isaac's remaining assignment of error. See App.R. 12(A)(1)(c).
{¶48} Accordingly, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.
JUDGMENT REVERSED AND CAUSE REMANDED.
Abele, J., concurring in judgment only with opinion:
{¶49} I concur in the judgment as I believe the opinion reaches the correct result, albeit an unfortunate result in view of the controlled substance found in appellant's vehicle. It is unfortunate that the West Virginia law enforcement officer did not solicit assistance from Ohio law enforcement officers to assist in the investigation, but I completely understand that in rural areas it is difficult, if not impossible, to summon assistance at a moment's notice.
{¶50} I write separately to point out that the Ohio Revised Code contains several statutes, in addition to those cited in the principal opinion, that speak to this issue. As part of a multi-state "Uniform Act on Close Pursuit," the Ohio General Assembly enacted several statutory provisions. R.C. 2935.29 defines fresh pursuit as the pursuit of a person reasonably suspected of committing a felony. R.C. 2935.30 speaks to the authority of foreign police to enter Ohio and provides that any officer from another state who enters the state of Ohio in fresh pursuit of a person believed to have committed a felony has the same authority to arrest and hold the person as has any Ohio law enforcement officer.
*363 {¶51} In the case sub judice, the West Virginia law enforcement officer (affiliated with the Ravenswood, West Virginia Police Department) observed appellant's vehicle display a partially obscured license plate, a minor misdemeanor violation. The officer then pursued appellant across the Ohio River bridge into Ohio. If the officer had reason to believe that appellant had committed a felony violation in West Virginia, R.C. 2935.29 and 2935.30 would have provided the officer the authority to pursue, arrest and detain appellant. Here, however, it appears that the minor misdemeanor traffic violation is the only violation that came to light prior to the investigative pursuit and stop. Consequently, in addition to the reasons cited in the principal opinion, it appears that, based upon the foregoing reasons, the West Virginia officer did not have the authority to pursue, detain and arrest appellant in the state of Ohio.
Harsha, J.: Concurs in Judgment and Opinion.
Abele, J.: Concurs in Judgment Only with Concurring Opinion.

At the arraignment, the trial court found Isaac to be "not indigent" but still appointed counsel. In late July 2017, Isaac fired his court-appointed counsel and hired two attorneys to represent him instead.

The trial court mistakenly uses the word "shore" interchangeably with the term "low water mark." The "low water mark" of a river is "the point to which the water recedes at its lowest stage." Black's Law Dictionary 1586 (7th Ed.1999). The "shore" of a river, however, refers to the "land lying between the lines of high- and low-water mark[.]" Id. at 1384. For clarity, we note that the low water mark of the Ohio River is the point to which water recedes at its lowest stage. Union Sand & Gravel Co. v. Northcott , 102 W.Va. 519, 528, 135 S.E. 589 (1926), citing John M. Gould, A Treatise on the Law of Waters , Section 27, at 63-64 & Section 46, at 106-107 (3d Ed.1900).

In his reply brief, Isaac requests that this Court take judicial notice of the exact location of the Ohio-West Virginia border at the Ravenswood Bridge. Although the taking of judicial notice is allowed at any stage of the proceedings, including appeal, see Evid.R. 201(F) ; City of Marietta v. Barth , 4th Dist. No. 99CA2, 2000 WL 2546, at *2 (Dec. 22, 1999), fn. 3, we decline to do so based on our findings above.