[Cite as *State v. McLoyd*, 2023-Ohio-3971.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                       No. 112107

v.                                      :

TAMARA MCLOYD,                          :

    Defendant-Appellant.        :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 2, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-669261-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brad Meyer, Assistant Prosecuting Attorney, *for appellee.*

Valore & Gordillo LLP and Michael Gordillo, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} In this companion appeal, defendant-appellant, Tamara McLoyd ("McLoyd"), appeals her convictions and sentence for aggravated robbery,

kidnapping, improperly handling firearms in a motor vehicle, and having a weapon while under disability.[1]  For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 2}  In April 2022, McLoyd and codefendants Jermaine Hagwood ("Hagwood") and Jada Hite ("Hite") were charged in a 21-count indictment stemming from a series of aggravated robberies, which occurred in the cities of Cleveland, Lakewood, and Cleveland Heights.[2]  Count 1 charged each of them with the aggravated robbery of Natalie Pape ("Pape").  Counts 2-4 charged each of them with the aggravated robbery, kidnapping, and felonious assault of Tanika Ghivens ("Ghivens").[3]  Counts 5-7 charged each of them with the aggravated robbery, kidnapping, and felonious assault of Sherri Gurka ("Gurka").  Count 8 charged each of them with the aggravated robbery of Happy Pizza.  Count 9 charged each of them with the aggravated robbery of Peggy Lyons ("Lyons").  Count 10 charged Hite with failure to comply and contained a furthermore specification stating that she operated "a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."  Counts 11 and 21 charged McLoyd with having a weapon while under

---

[1] This appeal is a companion case to *State v. Hagwood*, 8th Dist. Cuyahoga No. 112065 and *State v. McLoyd*, 8th Dist. Cuyahoga No. 112092.

[2] As of the date of this opinion, codefendant Hite has not filed a notice of appeal.

[3] In the indictment and jury instructions, this victim was also referred to as "Tinika L. Givhan."  For consistency, the victim will be referred to as "Ghivens" throughout, based on how the victim spelled her name during trial.

disability ("HWWUD"). Each of Counts 12, 15, 18, and 20 charged Hagwood with HWWUD. Count 13 charged Hite and McLoyd with improperly handling firearms in a motor vehicle. Count 14 charged Hite and Hagwood with the aggravated robbery of Christina Watters. Count 16 charged Hagwood with the aggravated robbery of Lindsay Sovchik. Count 17 charged Hagwood with the kidnapping of L.S. (d.o.b. 06/28/16). Count 19 charged McLoyd and Hagwood with the aggravated robbery of Madison MacArthur.[4]

{¶ 3} The matter proceeded to a jury trial in August 2022.[5] In midst of trial, Hite pled guilty to Counts 1, 2, and 10, as amended, and Counts 9 and 14, as charged, with Counts 3-8 and Count 13 nolled. The trial court sentenced Hite to a minimum of 17 years in prison. The trial then continued with McLoyd and Hagwood, the remaining codefendants. Relevant to this appeal, the following evidence was adduced at trial.

**Natalie Pape Robbery**

{¶ 4} Pape testified that on November 2, 2021, she "was robbed at gunpoint" while walking home from her boyfriend's house in Lakewood. (Tr. 558.) This happened somewhere between 9:00 p.m. – 9:30 p.m. on Bunts Road. Pape testified that as she was walking, a man and a woman ran up to her from behind, placed an "object" that felt like a gun firmly at her back and chest, demanded her

---

[4] Each of the counts, except Counts 11, 13, 21 contained various firearm specifications.

[5] McLoyd elected to have Counts 11 and 21 tried before the bench.

belongings, and took off with her purse in a car parked at Merl Avenue, which intersects with Bunts. Pape testified that both assailants were average height, wearing dark clothing, medical masks, and hats. Pape testified that her phone, keys, debit card, ID, and jewelry, about $105 to $110 in cash, and other miscellaneous things were in her purse. There was no video of the robbery, but video from a nearby residence was played for the jury that depicted Pape crossing the street and the assailants' vehicle pulling up to the corner of Merl. In two other videos played for the jury, the assailants can be observed walking at a rapid pace to catch up to Pape and running southbound after the incident.

{¶ 5} After the robbery, Pape walked to a nearby gas station and asked the cashier to call the police. Pape gave a statement to Lakewood Police Officer Jonathan Schmitz. When Pape returned home, she posted a warning about her incident on Facebook. Someone then sent her a video that same night of a robbery at Happy's Pizza, which was approximately three miles away from where her robbery occurred. Pape testified that she thought the same people could have carried out both incidents "[b]ecause two incidents in one night in a close area ma[d]e [her] worried." (Tr. 572.) Pape further testified that at 9:44 p.m. that night, she received an email alert that her debit card had been declined for a transfer to Cash App due to a lack of funds in the account. Pape testified Hite's name was associated with the transfer, and she did not know Hite nor did she give Hite permission to use her card.

{¶ 6} Lakewood Police Detective Daniel Hilfiker ("Det. Hilfiker") testified that he was assigned to investigate the Pape robbery. Pape contacted Det. Hilfiker

the day after the robbery informing him of a robbery at Happy's Pizza because "she felt that the people who had robbed her looked similar to the people who she saw in that video." (Tr. 1455.) Det. Hilfiker then spoke with Cleveland Police, who advised that a small four-door, dark colored Nissan Sentra was involved in the Happy's Pizza robbery. Det. Hilfiker then reviewed the video footage from a resident's house on Bunts, which showed that Pape's assailants arrived in "a blue small four-door Sedan" with silver and black rims. Det. Hilfiker testified he believed that the vehicle depicted in the Bunts Road surveillance video appeared to be the same vehicle seen in surveillance video from the Happy's Pizza robbery. Det. Hilfiker further testified that he learned from Cleveland Police that the Cleveland Heights Police Department was investigating a third robbery that occurred the same night involving suspects fleeing in a small blue Nissan Sentra.

{¶ 7} Aliyah Nelson ("Nelson") testified that she was in a relationship with Hite in November 2021. Nelson testified that Hite drove a blue Nissan at that time and she drove a silver Chevy Cruze. Nelson testified that she and Hite would often share their vehicles based on whichever keys were available. On November 4, 2021, Nelson was stopped by Cleveland police at the Rite Aid located at Clark and Fulton while she was driving the blue Nissan. At the time, Hite was driving Nelson's Chevy Cruze. The police brought Nelson back to the station where her phone was confiscated. Nelson's phone had a text conversation between her and Hite from around midnight on November 3, 2021 in which Hite texted Nelson, "I just got in a high-speed chase. I need to come to your house or sum." Nelson replied, "Okay,

Mya [Nelson's sister], there. I gotta make a run." (Tr. 623.) Later that evening, Nelson left her home at 5:00 p.m. and returned home the next day at 3:00 a.m. to find Hite at her house. They switched cars at some point later in the day on November 4, 2021. Nelson testified that Hite never returned her car and that she retrieved it from the police after Hite was arrested. Nelson told Det. Hilfiker that she took some items from the Chevy Cruze and threw them in the trash. Det. Hilfiker found a wine bottle and a pair of brown gloves in the trash. Nelson also told Detective Hilfiker the Instagram names "6.twin" and "_t.hefner," which were identified to be McLoyd's and Hite's respective Instagram accounts. (Tr. 1499, 1135-36.)

{¶ 8} Jeffrey Oblock ("Oblock"), a forensic scientist in the DNA department at the Cuyahoga County Regional Forensic Science Laboratory, testified that he tested the DNA swabs that were submitted from the mouth of the wine bottle and the brown gloves. Oblock testified that the DNA swab of the wine bottle matched Hagwood and Hite and the swab of the brown gloves matched both McLoyd and Hagwood.

{¶ 9} Matthew Seabold ("Seabold"), a crime analyst with the Crime Strategies Unit of the Cuyahoga County Prosecutor's Office testified that he reviewed cell phone records provided by cell phone providers and detectives and "drop[ped] the records into a mapping program that puts the records on a map." (Tr. 1368.) With regard to McLoyd's cell phone, her records failed to place her at any of the robbery locations from November 2, 2021. Rather, her cell phone records showed

her phone connecting to towers in a neighborhood in Cleveland during the Lakewood and Cleveland Heights robberies and it did not connect to any towers during the Happy's Pizza robbery.

**The Happy's Pizza Robbery**

{¶ 10} Gurka testified that in November 2021 she was employed as a cook at Happy's Pizza in Cleveland. On November 2, 2021, Gurka was working with Ghivens, who was employed as a driver. At closing time, around 11:00 p.m., the two of them were counting the money from one of the cash register drawers. They were on a FaceTime video call with their manager for assistance because they had never closed the store. While they were on the call, three people came into the store through the back door. The assailants demanded that Gurka open the registers. Gurka testified that she was unable to comply because she did not know how. As a result, one of the assailants struck her in the head twice with a pistol. Gurka testified that one of the assailants wore a camouflage jacket and a black hoodie. Gurka was unable to see any of their faces, which were covered with masks, and was unable to determine the gender of any individual. The assailants then asked for the safe and took the two of them to the back room to look for it. After realizing that there was no safe, the assailants shoved Gurka and Ghivens into the back room, roughed them up, closed the door, and then ran out.

{¶ 11} After the assailants left the scene, Gurka and Ghivens called the police. The manager, who had been on the FaceTime call, remained on the phone and also called the police. Gurka testified that the robbery was captured on

surveillance video, which was played for the jury. The video depicted a blue Nissan pulling up near the door of Happy's Pizza, with three individuals exiting the vehicle. Once inside, Gurka can be observed getting hit in the head because she could not open the cash register. The assailants then walked them to the back. The assailants can also be observed running out the back of the restaurant and leaving in the same car.

{¶ 12} Ghivens testified that at the time of the incident, she was employed as a driver for Happy's Pizza. Like Gurka's testimony, Ghivens testified that her and Gurka were closing the store with their manager on FaceTime when the assailants entered the store. The male assailant pointed a gun at her face. The assailants led them to the back in search of the safe. Ghivens testified that she had a gun in her possession that was inoperable. She testified that Happy's Pizza provided it for the delivery drivers for protection during night deliveries. While in the back room, the assailants pushed and punched Ghivens. The assailants found the gun and took it from Ghivens. Ghivens further testified that one of the assailants struck her in the head with a gun.

{¶ 13} Cleveland Police Officer Jacob Mullins ("Officer Mullins") testified that on November 2, 2021, he and his partner responded to Happy's Pizza for a robbery. His testimony corroborated Gurka's and Ghiven's testimony. Officer Mullins testified that he spoke to Gurka and Ghivens on the scene and they informed them that two black males and one black female entered the restaurant through the rear door and approached them at the cash register. One of the black males held a

small black firearm and pointed it at both victims. Gurka reported she was struck in the head two or three times for not being able to open the register. Ghivens then grabbed the keys and opened the cash register, where the other male and female grabbed roughly $300 and placed it in a to-go bag. At that point, the male with the handgun asked if there was a safe in the restaurant. Gurka and Ghivens both stated that they did not know if there was a safe, so the male with the handgun stuck the firearm in Gurka's back and forced her into the rear office and the other black male and female forced Ghivens into the same office. They were unable to locate the safe, so the black male with the handgun then searched Gurka and took her keys. The other black male and female searched Ghivens and took her gun, and then proceeded to strike both Gurka and Ghivens with the gun before running out the back door of the restaurant.

{¶ 14} Cleveland Police Detective Zachary New ("Det. New") testified that he also responded to Happy's Pizza on November 2, 2021. Det. New testified that he reviewed the surveillance footage that night. In reviewing the video, Det. New was able to determine that the suspect vehicle was a Nissan because of a "chrome-like, almost a U-shaped accent" on the front of the vehicle, which is unique to Nissans. (Tr. 1118.) From that, and other features of the vehicle, Det. New concluded the suspect vehicle was a 2018 or 2019 Nissan Sentra SR with a temporary plate.

{¶ 15} Det. New testified that Hite was arrested on November 4, 2021, when she returned the vehicle back to Nelson at her house. Instagram video from Hite's cell phone depicted Hite and McLoyd wearing the same clothes as seen in the

surveillance video of the Happy's Pizza robbery. McLoyd was "wearing the puffy Columbia jacket, the vest with the gray hoodie underneath and the black face mask[.]" (Tr. 1140.) Instagram video also depicted Hite and Hagwood wearing the same clothes as depicted in the robbery video. Det. New further testified that in Hite's Instagram videos, McLoyd is holding the black Smith & Wesson M&P Shield 9 mm handgun, which is the same type of gun that Ghivens reported was stolen from her. Det. New testified that they were able to identify McLoyd through Nelson and through the photographs on Hite's phone. Det. New stated, "[O]ne of the pictures that we found was actually a picture that [Hite] had taken of [McLoyd's] driver's license that was stored on her own phone, so it gave all the information from there." (Tr. 1150.) Det. New also found a pair of earrings and a wine bottle in the vehicle driven by Hite, which he testified belonged to the Lakewood victim.

{¶ 16} Det. New further testified that Hagwood was identified as the third suspect. Police recovered a black Glock 17, 9 mm handgun when he was arrested. Det. New testified that the gun the police recovered has similar characteristics to the one used during the Happy's Pizza robbery.

{¶ 17} Detective Robert Norman ("Det. Norman") of the Cleveland Police Department also responded to Happy's Pizza on November 2, 2021. Det. Norman testified that he learned that the Instagram handle _t.hefner was associated with McLoyd and maine_cedar_7103 was associated with Hagwood. Det. Norman testified that Instagram records from November 2, 2021, the date of the Happy's

Pizza robbery, show McLoyd telling Hagwood that she "has a lick," a common phrase used to denote a potential robbery.

**Peggy Lyons Robbery**

{¶ 18} Lyons testified she was staying at the Alcazar apartment/hotel complex in Cleveland Heights at Cedar. On November 2, 2021, she was walking home around 11:50 p.m. from the CVS located at Cedar and Lee Roads when she observed two people walking behind her. She stepped to the side to let them pass. Instead of passing her however, a female, later identified as McLoyd and a male, later identified as Hagwood, came up to her and said, "We are going to take your purse." (Tr. 742.) One of the assailants put their hand across Lyons's back, and then McLoyd said, "Give him your purse, or he'll shoot you." (Tr. 742-743.) Hagwood had a gun pointed at Lyons's chest "and was like, 'Give us your purse.'" (Tr. 743.) She described the gun as "Black. Had kind of a square at the barrel end of it." (Tr. 748.)

{¶ 19} Lyons testified that her purse contained her original birth certificate, cell phone, driver's license, a ring, bank statements, debit cards, business cards, and her personal contacts. She testified that both individuals were African-American, wore black hoodies and face masks, and the female subject had short thick dreadlocks. Lyons further testified that right after the initial incident, she followed her assailants. She stepped out on the street and happened to observe a police car approaching. Lyons reported to the officer that her purse was stolen. Lyons further reported that the assailants' vehicle was located at the corner of Lamberton and

Cedar. She testified that it was a four-door sedan with its flashers on and an unknown exterior color. The officer then chased after the car. Lyons continued on her walk when she was reapproached by the officer, who advised that the chase was called off and asked for details about the event. (Tr. 749, 760.)

{¶ 20} After the robbery, Lyons received a bank statement for her stolen debit card, which included a Dominion Energy transaction for $1,147.65. Cleveland Heights police detectives were able to determine that the Dominion Energy charge was connected to the utility bill for Jerrelle and B.H., whom Lyons did not know. The detectives learned that Jerrelle Harkness ("Jerrelle") was in a relationship with Hagwood in November 2021. Hagwood and Jerrelle lived together at that time. Jerrelle testified that the bill was paid over the phone and the account was under her daughter's name, B.H. Jerrelle further testified that she did not know Lyons.

{¶ 21} Cleveland Heights Police Officer Michael Dugan testified that while on patrol on November 2, 2021, he observed two people running across Cedar Road northbound towards Cedar Hill Baptist Church. As he approached that area, a female ran up to his car, yelling "'They stole my purse,' and pointed to a vehicle pulling out of the east parking lot of Cedar Hill Baptist Church." (Tr. 994.) He attempted to stop the vehicle, which was a blue, Nissan four-door sedan, with his lights and sirens. He continued to pursue the vehicle until it was terminated by his officer-in-charge.

{¶ 22} Cleveland Heights Police Detective William Robinson ("Det. Robinson") testified that he was assigned to investigate the Lyons's robbery. He

obtained video footage from surveillance cameras at a medical center near the incident. The video was played for the jury. In the video, Lyons and two individuals can be observed in the general area and time, but it does not capture the robbery. Det. Robinson also testified that he worked with Cleveland and Lakewood police looking into any similarities in the robberies. He learned that a blue Nissan was involved in both the Cleveland and Lakewood incidents. He further learned that the car was located and that Nelson was driving it at the time. The text Nelson shared from Hite regarding Hite's involvement in a high speed chase confirmed their belief that this was the same car involved in the Lyons's robbery.

{¶ 23} Following the conclusion of trial, the jury found McLoyd guilty of aggravated robbery as charged in Counts 1, 2, 5, 8, and 9, with one- and three-year firearms specifications, guilty of kidnapping as charged in Counts 3 and 6, with one- and three-year firearms specifications, and guilty of improperly handling firearms in a motor vehicle as charged in Count 13. The jury found McLoyd not guilty of felonious assault as charged in Counts 4 and 7, and not guilty of aggravated robbery as charged in Count 19. The trial court found McLoyd guilty of HWWUD as charged in Count 11 and not guilty of Count 21, which also charged McLoyd of HWWUD.[6]

{¶ 24} At sentencing, the court found that Counts 2 and 3 and Counts 5 and 6 were allied offenses of similar import, and that Count 8 was an allied offense of Counts 2 and 5. The state elected to proceed to sentencing on Counts 2 and 5. The

---

[6] Hagwood was found guilty of Counts 1, 2, 5-9, 12, 14, 15, 16, 18, 19, and 20 with firearm specifications. The trial court sentenced Hagwood to 49 years in prison.

trial court sentenced McLoyd to six years in prison on Count 1, seven years in prison on Count 2, eight years in prison on Count 5, eight years in prison on Count 9, and 12 months in prison on Count 13. The trial court also sentenced McLoyd to 3 years in prison for each of the accompanying firearm specifications, for a total of 12 years in prison. The trial court found Counts 1, 2, 5, and 9 to be qualifying felonies under the Reagan Tokes Law and imposed a term of 8 to 12 years in prison. The court ordered that McLoyd was to serve all the firearms specifications consecutively and prior to concurrent prison terms on the underlying felonies. McLoyd was also sentenced on her two other lower court cases, which were combined in an omnibus judgment entry of conviction and sentence resulting in "a net prison term of life without first parole eligibility until after 47 years." (Oct. 7, 2022 Omnibus Judgment Entry of Conviction and Sentence in Case Numbers 666570, 669261 and 669473, as amended on Oct. 11, 2022.)

{¶ 25} McLoyd now appeals, raising the following six assignments of error for review:

> **Assignment of Error One:** The trial court prejudiced [McLoyd] and committed reversible error by incorrectly advising the petit[ ] jury that the grand jury's indictment meant that the grand jury found [McLoyd] was "more likely than not" guilty.
>
> **Assignment of Error Two:** Joinder of [McLoyd]'s and co-defendant's cases for trial was impermissibly prejudicial to [McLoyd] and constituted plain error.
>
> **Assignment of Error Three:** [McLoyd]'s convictions are not supported by sufficient evidence.
>
> **Assignment of Error Four:** [McLoyd]'s convictions are against the manifest weight of the evidence.

**Assignment of Error Five:** The trial court committed reversible error prejudicing [McLoyd] by permitting the State's use of expert testimony and exhibits given and produced by a witness with no expertise.

**Assignment of Error Six:** The trial court committed reversible error prejudicing [McLoyd] when it imposed an unconstitutional sentence upon [McLoyd] pursuant to the "Reagan-Tokes Law," which is unconstitutional on its face.

## II. Law and Analysis

### A. Jury Advisement

{¶ 26} In the first assignment of error, McLoyd argues that the trial court prejudiced her and committed reversible error by incorrectly advising the petit jury that the grand jury's indictment meant that the grand jury found that McLoyd was "more likely than not" guilty.

{¶ 27} In the instant case, a review of the records reveals that, prior to jury selection, the trial court explained to the prospective jurors the process of a criminal case, starting with a defendant's indictment and grand jury proceedings. The court stated:

> An indictment is returned when the prosecutor presents evidence to a grand jury. When the prosecutor presents evidence to a grand jury, that proceeding is almost always one-sided. In other words, the Defendant or Defendants or their representatives are not present at the grand jury proceedings.
>
> Moreover, a grand jury, which is composed of people like yourselves who do this duty for several weeks at a time and hear a fair number of cases, it does not have to be unanimous, and a grand jury is only asked to determine whether there is probable cause to believe that a person suspected of committing a crime committed the crime.

If the grand jury does find probable cause to believe that appears more likely than not that the person did commit the crime, then that grand jury returns an indictment and it comes here for your consideration.

* * *

At trial, though, the Defendants are presumed innocent. That presumption stays in place until you as a jury have found that the proof is such as to exclude every reasonable doubt of the guilt of any particular Defendant on a particular charge.

Reasonable doubt is present when after the jurors have carefully considered a charge they cannot say that they are firmly convinced of the truth of a charge. Reasonable doubt is a doubt based upon reason and common sense. Reasonable doubt is not mere possible doubt, because everything related to human affairs or dependent upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her affairs.

(Tr. 81-82.)

{¶ 28} McLoyd argues that "probable cause" and "probably" do not have the same meaning because the probable-cause standard depends on the totality of the circumstances and is incapable of precise definition or quantification into percentages. She further argues that criminal defendants are entitled to a presumption of innocence.

{¶ 29} We note, however, that McLoyd did not object to the trial court's comments, and thus, has waived all but plain error on appeal. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 80, citing *State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992); Crim.R. 52(B). "Plain error occurs when, but for the error, the outcome of the trial clearly would have been otherwise." *State*

*v. Allen*, 73 Ohio St.3d 626, 635, 653 N.E.2d 675 (1995), citing *State v. Long*, 53 Ohio St.2d 91, 96-97, 372 N.E.2d 804 (1978).

{¶ 30} As the above statements indicate, immediately after explaining the grand jury process, the court then explained that defendants are presumed innocent and the burden of proof at trial is beyond a reasonable doubt. We cannot say that these remarks rise to the level of plain error. Moreover, the court reexplained the beyond-a-reasonable-doubt burden of proof during its charge to the jury at the end of trial. (Tr. 1601-1602.) The court clearly differentiated "probable cause" from "beyond a reasonable doubt," and did not lower the prosecution's burden of proof. Therefore, we cannot say that but for the court's comments during its introductory instructions to prospective jurors, the outcome of the trial clearly would have been different.

{¶ 31} Accordingly, the first assignment of error is overruled.

**B. Joinder of Trial**

{¶ 32} In the second assignment of error, McLoyd argues that she was prejudiced by the joinder of her trial with codefendants Hite and Hagwood.[7] McLoyd claims that she was found guilty by association with Hite and Hagwood because she was convicted of numerous robberies and attendant charges without a single witness identifying her, a single DNA match, or a single piece of stolen property found in her possession.

---

[7] We note that Hite pled guilty during trial and the trial continued only with McLoyd and Hagwood.

{¶ 33} Typically, we review the trial court's ruling on joinder for an abuse of discretion. *State v. Quinn*, 8th Dist. Cuyahoga No. 110692, 2022-Ohio-2038, ¶ 12, citing *State v. Lee*, 8th Dist. Cuyahoga No. 104682, 2017-Ohio-1449, ¶ 15. However, "'to properly preserve the issue of a trial court's joinder of indictments for appeal, the defendant must object to the joinder of indictments at the time of trial, and at the close of the state's case or at the close of evidence.'" *Quinn* at ¶ 13, quoting *State v. Frazier*, 8th Dist. Cuyahoga Nos. 106772 and 106773, 2019-Ohio-1433, ¶ 11. Because McLoyd failed to object to joinder in the instant case, we review for plain error.

{¶ 34} Crim.R. 13 provides that a trial court may order two or more indictments to be tried together "if the offenses or the defendants could have been joined in a single indictment or information." Under Crim.R. 8(A), "[t]wo or more offenses may be charged in the same indictment * * * if the offenses charged * * * are of the same or similar character, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

{¶ 35} The Ohio Supreme Court has stated that the "[j]oinder of defendants and the avoidance of multiple trials is favored in the law for many reasons. Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980). We recognize that "a

'joinder cannot result in prejudice if the evidence of the offenses joined at trial is simple and direct, so that a jury is capable of segregating the proof required for each offense.'" *State v. Harris*, 8th Dist. Cuyahoga No. 104833, 2017-Ohio-2985, ¶ 13, quoting *State v. Lytle*, 10th Dist. Franklin Nos. 15AP-748 and 15AP-754, 2016-Ohio-3532, ¶ 65.

{¶ 36} We do not find that the joinder in the instant case prejudiced McLoyd. Our review of the record demonstrates that the charges against McLoyd and her codefendants were similar in character and were based on two or more acts constituting parts of a common scheme or plan under Crim.R. 8(A). Here, McLoyd was convicted for three aggravated robberies that occurred within hours of each other on the night of November 2, 2021. In each incident, the evidence at trial demonstrated that she acted together with Hite and Hagwood demanding items from the victims.

{¶ 37} Moreover, the jury was able to segregate the proof required for each offense and found McLoyd guilty of three out of the four robberies she was charged with. "Evidence is 'simple and direct' if the trier of fact is capable of segregating the proof required for each offense." *State v. Belle*, 8th Dist. Cuyahoga Nos. 107046 and 107300, 2019-Ohio-787, ¶ 25, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, 937 N.E.2d 136, ¶ 39 (10th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 759 N.E.2d 1240 (2002). While there were multiple codefendants and numerous charges, the jury, in the instant case, was able to segregate the proof required for

each offense and found McLoyd not guilty of the charges stemming from the November 19, 2021 robbery.

{¶ 38} Because the charges against McLoyd and her codefendants were similar in character and were based on two or more acts constituting parts of a common scheme or plan, and McLoyd was found guilty of some counts and not guilty on other counts, it is clear that any association with the codefendants did not prejudice McLoyd and did not result in plain error.

{¶ 39} Therefore, the second assignment of error is overruled.

**C. Sufficiency of the Evidence**

{¶ 40} In the third assignment of error, McLoyd argues that while there was ample evidence to link her codefendants to the crimes, there was insufficient evidence to sustain her convictions because there was no testimony identifying her as one of the perpetrators. McLoyd claims that she was not identified by a single witness, she was not identifiable on any of the video surveillance, she does not own either vehicle used in the robberies, her DNA was a minor contributor on a pair of gloves, which resemble, but were never proven to be the gloves observed on the surveillance footage, and her phone "pinged" off some towers in the general area of a few robberies.

{¶ 41} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 42} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 43} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 44} Because none of the victims in the instant case could identify McLoyd as one of their assailants, the state relied on circumstantial evidence to convict

McLoyd. We note that "'[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *Brook Park v. Gannon*, 2019-Ohio-2224, 137 N.E.3d 701, ¶ 24 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13.

{¶ 45} In contrast, "circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id.*; *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683 ("Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind." *Id.* at ¶ 37, citing *State v. Griesheimer*, 10th Dist. No. 05AP-1039, 2007-Ohio-837, citing *State v. Bentz*, 2 Ohio App.3d 352, 442 N.E.2d 90 (1st Dist. 1981).) The Ohio Supreme Court has "long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990), citing *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E. 2d 1049 (1978); *State v. Graven*, 54 Ohio St.2d 114, 374 N.E. 2d 1370 (1978).

{¶ 46} The state presented evidence that three individuals acted in concert and participated in a crime spree on the night of November 2, 2021. Each of the three robberies had similar descriptions for the vehicle and the assailants involved — three individuals and a blue Nissan. "In Ohio, when an individual acts to aid or abet a principal in the commission of an offense, the individual and principal are equally guilty and the individual is prosecuted and punished as if he were a principal offender." *State v. Wingfield*, 8th Dist. Cuyahoga No. 107196, 2019-Ohio-1644, ¶ 65, citing R.C. 2923.03(F).[8]

{¶ 47} Here, the evidence against McLoyd came from her own conversations and Instagram records, which indicate she was with her codefendants when the robberies occurred and they were in possession of the clothing worn, firearms used, and vehicle used during the times of the robberies. During the day of the robberies, McLoyd told Hagwood that she had a "lick," which is a robbery to hit. This message indicates both her relation to Hagwood as well as her intention to commit a robbery with him that day. Additionally, the video and social media evidence produced at trial identifies McLoyd as one of the assailants involved in the three aggravated robberies. Surveillance video from Happy's Pizza depicts three individuals enter from the rear of the restaurant, approach the front counter, brandish firearms,

---

[8] The trial court instructed the jury on complicity, stating that "[f]or each count the defendants are not only charged as a principal offender, but they are also charged as a person who was complicit in the crimes charged by aiding and abetting another person in committing the crimes while acting with the same mental state required to commit the crimes." (Tr. 1625.)

empty the registers, and walk two victims to a small office in the back of the restaurant before fleeing in a Nissan Sentra.

{¶ 48} Instagram records depict Hite and McLoyd together in the Nissan Sentra, just after midnight on November 3, 2021, with cash and firearms and wearing the same clothes seen in the surveillance video from Happy's Pizza. Instagram videos were recorded and posted minutes after the Cleveland Heights robbery occurred. In the video, Hite is wearing the same black pants and black Adidas hoodie and McLoyd is wearing the same hoodie under a black puffer vest that the assailants are wearing in the Happy's Pizza footage. Furthermore, Hite had a photo of McLoyd's driver's license on her phone, which police used to confirm McLoyd's identity. We find that the foregoing circumstantial evidence, when viewed in a light most favorable to the state, identifies McLoyd as one of the assailants, who acted in concert with Hite and Hagwood, and supports McLoyd's convictions.

{¶ 49} Therefore, the third assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 50} In the fourth assignment of error, McLoyd refers to events not charged, nor presented in the instant case. It is the appellant's duty to properly cite the alleged error in the record. App.R. 16. App.R. 12 provides appellate courts with the discretion to disregard an assignment of error for the failure to comply with App.R. 16. Because McLoyd has failed to properly cite the alleged error in the record, we decline to address her argument.

**{¶ 51}** However, even if the manifest weight issue was properly raised in the matter before us, we find that this is not the exceptional case in which the evidence weighs heavily against a conviction. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 52}** Therefore, the fourth assignment of error is overruled.

### E. Mapping of Cell Phone Data Testimony and Exhibits

**{¶ 53}** In the fifth assignment of error, McLoyd, citing to Evid.R. 702, contends the trial court committed reversible error by permitting expert testimony and exhibits to be introduced into evidence from Seabold, who was a lay witness.[9] Specifically, McLoyd argues that by allowing this testimony, the state is abusing the business records exception by getting expert testimony without relying upon an expert.

**{¶ 54}** The admission or exclusion of evidence is a matter left to the trial court's sound discretion and will not be disturbed absent an abuse of discretion. *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 40, citing *State v. Frazier*, 8th Dist. Cuyahoga No. 97178, 2012-Ohio-1198, ¶ 17. An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

---

[9] Evid.R. 702 governs expert testimony.

{¶ 55} We initially note that McLoyd's reliance on Evid.R. 702 is misplaced because Seabold was not offered as an expert witness and the trial court did not recognize him as such. In fact, a review of the record reveals that Seabold repeatedly clarified that he was not an expert. Rather, Seabold explained that he takes the information from records provided by the cell phone providers and the detectives investigating the cases and generates a map of a defendant's cell phone location.

{¶ 56} Our court has repeatedly found this type of testimony admissible. *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 43-46 (a layperson could compare the locations depicted on the phone records to the corresponding location on the analyst's site map.); *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 68-72 (8th Dist.) (testimony regarding a comparison of cell phone date records to locations where crimes occurred does not require "specialized knowledge, skill, experience, training, or education" regarding cellular networks); *State v. Bradford*, 2018-Ohio-1417, 101 N.E.3d 710, ¶ 86 (8th Dist.), citing *State v. Wilson*, 8th Dist. Cuyahoga No. 104333, 2017-Ohio-2980 (cell phone tower mapping by a lay person permits an inference to be drawn by the factfinder that the cell phone owner was in the area at the listed time and to corroborate other evidence of the defendant's presence at a crime scene); *State v. Lucus*, 2020-Ohio-1602, 154 N.E.3d 262, ¶ 98 (8th Dist.) (testimony about the defendant's cell phone records, the location of the cellular tower defendant's phone connected to, or a map based on this information was admissible as lay testimony).

{¶ 57} In light of the foregoing, we find that Seabold's testimony was admissible as lay testimony. Furthermore, Seabold's testimony regarding the McLoyd's cell phone did not appear to have a prejudicial effect because her cell phone did not place her at any of the robbery locations for which she was convicted.

{¶ 58} Therefore, the fifth assignment of error is overruled.

**F. Sentence**

{¶ 59} In the sixth assignment of error, McLoyd challenges the application of the Reagan Tokes Law to her sentence.

**1. Reagan Tokes Law**

{¶ 60} McLoyd first argues that trial court committed reversible error when it imposed an unconstitutional sentence under the Reagan Tokes Law because the law violates her constitutional rights to a jury trial, due process, and the separation-of-powers doctrine.[10]

{¶ 61} In *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, the Ohio Supreme Court recently addressed similar arguments and found the Reagan Tokes Law to be constitutional. The *Hacker* Court determined the law does not violate the separation-of-powers doctrine, the right to a jury trial, or the right to due process. *Id.* at ¶ 41. In light of this ruling, as well as the fact that McLoyd's arguments do not present novel issues or any new theories challenging the constitutional validity of

---

[10] McLoyd argues in the alternative that the matter should be reviewed for plain error because "trial counsel failed to object[.]" A review of the record, however, reveals that trial counsel did object to the imposition of the Reagan Tokes Law. (Tr. 1840.) Therefore, we decline to review for plain error.

any aspect of the Reagan Tokes Law left unaddressed by the *Hacker* Court, we find these arguments unpersuasive.

### 2. Prison Term

{¶ 62} McLoyd next argues that the trial court failed to comply with R.C. 2929.144(B)(3) when it imposed "presumptive minimum terms and potential maximum terms on all qualifying felonies, not just one."

{¶ 63} For felony offenses sentenced under the Reagan Tokes Law, the trial court is required to impose an indefinite sentence with a stated minimum term selected by the court and a calculated maximum term determined in accordance with R.C. 2929.144, which provides the framework for the calculation of the maximum term. R.C. 2929.14(A)(1)(a). R.C. 2929.144(B)(3) governs the calculation of the maximum prison term when there are multiple counts that are to run concurrently.

{¶ 64} McLoyd argues that the court can only impose a single maximum term under R.C. 2929.144(B)(3) based on the use of "term" in the singular. This section provides in relevant part:

> If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that all of the prison terms imposed are to run concurrently, the maximum *term* shall be equal to the longest of the minimum terms * * * plus fifty per cent of the longest minimum term for the most serious qualifying felony being sentenced.

(Emphasis added.) R.C. 2929.144(B)(3).

{¶ 65} However, while R.C. 2929.144 governs the calculation of the maximum term, R.C. 2929.14(A) governs the imposition of indefinite sentences. *State v. Wilson*, 8th Dist. Cuyahoga No. 111755, 2023-Ohio-1042, ¶ 68. R.C. 2929.14(A)(1)(a) provides:

> For a *felony* of the first degree committed on or after the effective date of this amendment, *the prison term shall be an indefinite prison term with a stated minimum term* selected by the court of three, four, five, six, seven, eight, nine, ten, or 11 years *and a maximum term* that is determined pursuant to section 2929.144 of the Revised Code * * *.

(Emphasis added.)

{¶ 66} Both sections state that "'the prison term shall be an indefinite prison term with a stated *minimum term* selected by the court * * * *and a maximum term* that is determined pursuant to section 2929.144 of the Revised Code * * *.'" (Emphasis sic.) *State v. Gutierrez-Reynoso*, 11th Dist. Lake No. 2022-L-130, 2023-Ohio-3122, ¶ 93. Thus, under these sections, the trial court is required to impose both a stated minimum term and a maximum term determined by the formula set forth in R.C. 2929.144. *Wilson* at ¶ 69; *Gutierrez-Reynoso* at ¶ 93. This is exactly what the trial court did in the instant case.

{¶ 67} Therefore, based on the foregoing, the sixth assignment of error is overruled.

## III. Conclusion

{¶ 68} The trial court's advisement to prospective jurors regarding the grand jury's indictment did not constitute plain error. Neither did McLoyd's joinder of trial with Hite and Hagwood. Based on the jury's verdict, it is clear that McLoyd was

not prejudiced by the joinder. We also find that there was sufficient evidence in the record to identify McLoyd as one of the assailants who participated in this crime spree. McLoyd's manifest weight challenge was not properly raised. However, even if we were to consider it, we find that this is not the exceptional case in which the evidence weighs heavily against a conviction. We further find that Seabold's testimony regarding the information he took from cell phone records and the map he generated of the defendant's cell phone location was admissible as lay testimony. Lastly, McLoyd's arguments regarding the constitutionality of the Reagan Tokes Law do not present novel issues or new theories challenging the constitutional validity of any aspect of law left unaddressed by the *Hacker* Court. In addition, both R.C. 2929.144 and R.C. 2929.14(A) require the trial court to impose both a stated minimum term and a maximum term determined by the formula set forth in R.C. 2929.144, which is exactly what the trial court did in the instant case.

{¶ 69} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

ANITA LASTER MAYS, A.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR